Norma Antonia JACINTO and Ronald Garcia, Petitioners,

v.

IMMIGRATION AND NATURALIZATION SERVICE, Respondent.

No. 98–70321.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 3, 1999.

Filed March 14, 2000

---

726

Edgardo Quintanilla, Sherman Oaks, California, for the petitioners.

Marshall Tamor Golding, Office of Immigration Litigation, United States Department of Justice, Washington, D.C., for respondent.

Before: BRIGHT,* REINHARDT, and TROTT, Circuit Judges.

BRIGHT, Circuit Judge:

Norma Antonia Jacinto Carrillo ("Jacinto") and her son, Ronald Garcia, are natives and citizens of Guatemala. On behalf of herself and her son, Jacinto[1] petitions this court for review of the Board of Immigration Appeals' ("Board") decision denying her application for asylum and withholding of deportation. She also contests the Board's denial of voluntary departure pursuant to section 244(e) of the Immigration and Nationality Act ("Act"). 8 U.S.C. § 1254(e). We have jurisdiction over this petition pursuant to 8 U.S.C. § 1105a(a).

I.

In December, 1994, Jacinto filed an affirmative asylum application with the Immigration and Naturalization Service ("INS"). Therein she alleged that members of the Guatemalan military were persecuting her and her family, including her common-law husband who is a former member of the Guatemalan military. In March, 1995, the INS issued an Order to Show Cause and Notice of Hearing.

Following two hearings, one on August 25, 1995, and the second on January 11, 1996, the Immigration Judge denied Jacinto's application for asylum, withholding of deportation, and voluntary departure. *See* Admin. R. at 29–30. The Immigration Judge found that Jacinto did not have a well-founded fear of persecution because she could not explain why members of the military were pursuing her and her husband and had not demonstrated a subjective fear of persecution. In addition, the Immigration Judge found that Jacinto's testimony throughout the proceedings was not credible. *See* Admin. R. at 29–30.

Jacinto appealed the Immigration Judge's decision to the Board arguing that her right to a fair hearing had been denied and that the Immigration Judge erred when he denied her application for asylum. The Board determined that the Immigration Judge did not violate Jacinto's due process rights and that the Immigration Judge properly held that Jacinto had failed to establish a well-founded fear of persecution. The Board also affirmed the Immigration Judge's decision ruling Jacinto ineligible for voluntary departure due to Jacinto's statements that she was unwilling to leave the United States.

Jacinto petitions this court and argues that the Board erred when it failed to find that the Immigration Judge denied her a full and fair hearing by not permitting Jacinto to testify by narration, and otherwise in the manner of conducting the hearing. In addition, Jacinto argues that the Board erred by failing to adequately review the evidence and by failing to find that the Immigration Judge did not adequately seek to qualify Jacinto for voluntary departure.

We reverse and remand on the ground that Jacinto's due process rights were violated.

II.

This court reviews claims of due process violations in deportation proceedings de novo. *See Getachew v. INS*, 25 F.3d 841, 845 (9th Cir.1994).

The Fifth Amendment guarantees that individuals subject to deportation proceedings receive due process. *See Campos–Sanchez v. INS*, 164 F.3d 448, 450 (9th Cir.1999). Due process requires that an alien receive a full and fair hearing. *See id.* In addition to constitutional protections, there are statutory and regulatory safeguards as well. *See Barraza Rivera v. INS*, 913 F.2d 1443, 1447 (9th Cir.1990). For example, individuals in de-

---

* The Honorable Myron H. Bright, Senior United States Circuit Judge for the Eighth Circuit, sitting by designation.

1. References to "Jacinto" apply also to Ronald Garcia, who is subject to the same rulings as his mother.

portation proceedings are entitled to present personal testimony in their behalf. *See* 8 C.F.R. § 240.10(a)(4)(1999) (respondent has a reasonable opportunity to present evidence in his or her behalf); 8 U.S.C. § 1229a(b)(1) (immigration judge shall receive evidence). When these protections are denied, and such denial results in prejudice, the constitutional guarantee of due process has been denied. *See Campos–Sanchez,* 164 F.3d at 450; *Barraza Rivera,* 913 F.2d at 1447. Prejudice occurs when the rights of the alien have been transgressed in such a way as is likely to impact the results of the proceedings. *See Campos–Sanchez,* 164 F.3d at 450.

The case record consisted of two hearings with different immigration judges presiding at each hearing. At the first hearing, the Immigration Judge, in considering only the case of Ronald Garcia, informed Jacinto that she had a right to have an 'attorney speak for her son or that she could speak for her son. *See* Admin. R. at 33–34. The judge did not advise her that either way she could be a witness for him. Similarly, at her second hearing, where *her* application was to be considered, she was offered a choice between having an attorney and speaking for herself; again, the implication was that she might not be able to speak, i.e., testify, if she selected an attorney to present her arguments. *See* Admin. R. at 47. The Immigration Judge then told Jacinto that she could present documentary evidence in support of her asylum application and that she could call witnesses in support of her claim. *See* Admin. R. at 48. The Immigration Judge informed her that the government also might be submitting documentary evidence against her. *See id.* The Immigration Judge further informed Jacinto that the judge would question her, and counsel for the government would follow with further questioning. *See* Admin. R. at 48–49.

■ In our view, this information was incomplete and inadequate to satisfy the "full and fair hearing" requirement. First, the immigration judges inadequately explained the hearings' procedures to Jacinto; neither judge asked, or otherwise determined, whether Jacinto understood the legal procedures, and neither judge explained what Jacinto had to prove in order to establish asylum. Second, the judges failed to explain adequately what Jacinto's various roles could be at the hearing. They did not sufficiently explain that Jacinto could be a witness even if she obtained an attorney. The judges also failed to explain, for example, how the hearing would be conducted if Jacinto chose to represent herself. At no point was Jacinto advised that she could both testify on her own behalf and serve as an advocate by making arguments to the judge and explaining the evidence to him.[2] Third, while Jacinto was told that she would be questioned by the judge and counsel for the government, she was not told that she could present her own affirmative testimony in narrative form. From our reading of the record, we conclude that Jacinto did not understand her rights in the hearing procedure.

In addition to receiving an inadequate explanation of her rights, Jacinto was also denied a "reasonable opportunity" to present her evidence. *See* 8 C.F.R. § 240.10(a)(4)(1999) (providing that alien will have a reasonable opportunity to present evidence). After preliminary matters were dealt with, the judge told Jacinto to take the stand, and immediately commenced his interrogation of her. Next, the judge offered the government the opportunity to cross-examine Jacinto. The government's cross-examination was interspersed with further questioning by the judge. Jacinto was then excused from the stand, after a brief discussion regarding voluntary departure. At no point did the judge ask Jacinto if she wished to offer

2. At the initial hearing, the Immigration Judge gave Jacinto a legal aid list containing the names of organizations and attorneys who might help for little or no fee.

affirmative testimony while she was testifying, ask her whether she wanted to testify in narrative form, or otherwise afford her an opportunity to present direct testimony. Thus, in addition to not explaining to Jacinto that she had a right to present affirmative testimony, the judge did not provide her with a "reasonable opportunity" to do so.

We begin our discussion with some limited information from the record about the background of Jacinto. The information in the record elicited during the initial questioning indicates that Jacinto, of Guatemalan descent, married at sixteen years of age. She is the mother of four children: two by her first husband, who is now deceased, and two other daughters by her common-law husband, Francisco Javier Lopez, with whom she lives presently in the United States. *See* Admin. R. at 50–51.

With this background, we examine the transcript to determine whether the proceedings were, in fact, explained to Jacinto to the extent that she could comprehend them, make an appropriate choice regarding counsel and participate, with or without counsel, in developing the record to support the claims of her son and herself.

We start with the initial hearing of August 24, 1995, concerning her son Ronald Garcia.[3] At that hearing, the Immigration Judge discussed her son's right to an attorney. The transcript of this matter is reproduced below:

> Q. AT [sic] this hearing he has a right to an attorney at his own expense, at his family's expense. You are now being handed a Form I–618 and also a copy of the local legal aid list which contains the names of organizations and attorneys who may be able to help him for little or not [sic] fee. Do you under-

stand all that I've said so far, Ms. Jacinto Carrillo?

> A. Yes.

> Q. All right. Do you wish the Court to give you additional time to get an attorney to speak for you, rather for your son, in these proceedings, or do you wish to speak for him?

> A. Yes.

> Q. Which one?

> A. The problem is—

> Q. Which one? I don't want to hear about the problems, I just want to know whether you want to speak for him or whether you want time to get an attorney to speak for him?

> A. I want to speak for him.

> Q. All right. At this hearing, your son has certain rights, one, to present evidence in his own behalf; two, to examine and object to evidence presented against him; and three, to question any witnesses brought into hearing. Do you understand the rights that your son enjoys?

> A. Yes.

Admin. R. at 33–34.

The likely misunderstanding surfaces in Jacinto's answer "The problem is—" Admin. R. at 34. A reasonable interpretation of this colloquy is that Jacinto was given a choice: either she could get an attorney to speak for her son or she could speak for her son, but not both.

This is not the rule. She could have obtained an attorney and she also could have spoken for her son as a witness (and as an adviser to the attorney). This was never clearly explained to her. In other words, from the standpoint of this unsophisticated witness, the court gave her the

**3.** The initial hearing of August 24, 1995, began as a deportation hearing for Ronald. During that hearing, the Immigration Judge learned that Jacinto also was scheduled for a hearing that same day. *See* Admin. R. at 38. The Immigration Judge asked Jacinto to designate a country to which Jacinto would be sent should deportation become necessary. When Jacinto failed to name a country, the Immigration Judge directed deportation for Jacinto to Guatemala if deportation became necessary and rescheduled the cases for an asylum merits hearing. *See* Admin. R. at 41–42.

choice of either being silent or getting somebody else to speak for her son.

Her general misunderstanding about the hearing process and the matters to be resolved is reflected in various places throughout the record. For example, the confusion regarding voluntary departure is indicated in the following excerpt from the transcript of the initial hearing:

Q. All right. In his behalf, do you admit that he [Ronald Garcia] is deportable and that he entered the United States without inspection?

A. That's if I admit?

Q. Yes, do you concede that your son, Ronald, in behalf of your son that he is deportable, that is, that he could be sent out of the United States because he entered this country illegally, that is that he entered the United States without inspection?

A. Yes.

Q. All right. If deportation becomes necessary, your son has the right to choose the country to which he will be sent. In that event, what, if any, country does he choose?

A. Well, it's safe here.

Q. Well, if he's ordered to leave here, what, if any, country does he wish to be sent, deported to?

A. Any other country but Guatemala.

Q. All right, well, does he wish to name a country, yes or no?

A. Like, Washington or—

Q. Country.

A. Any other place.

Q. Does he wish to name a country, yes or no? Yes or no?

A. Washington.

Q. What country is Washington?

A. I don't know, but—

Q. I don't either.

A. But we don't want to leave here.

Q. Yes. Well, I'll show that the Respondent's [sic] declined to name a country. . . .

Admin. R. at 35–36. These responses make clear that Jacinto never actually understood what she was being asked to do with respect to voluntary departure.

The ambiguity of the language explaining self-representation or having an attorney continued during the latter part of this initial hearing. The Immigration Judge stated that Jacinto was scheduled for a hearing the same day as her son, and the following inquiry occurred:

Q. Do you remember everything that I told you regarding your son's right to an attorney?

A. Yes.

Q. The same thing applies for you. Do you understand?

A. Yes.

Q. And you've already been given a Form I–618 and a legal aid list and we'll give you another one right now. Do you want time to get an attorney to speak for you or do you want to speak for yourself?

A. I'd like to speak for myself.

Q. All right. As I advised you a moment ago of the rights that your son had as far as presenting evidence in his own behalf. The same rights apply to you. Do you recall?

A. Yes.

Admin. R. at 39–40.

The ambiguity is apparent. Jacinto may well have believed that she was being given a choice between speaking for herself at the proceedings or having an attorney. The court never adequately explained to her that she could have an attorney and also speak for herself, by being a witness, or that if she took the part of the attorney herself, she could still present her own testimony in narrative form, in addition to acting as an advocate.

We turn next to the deportation hearing conducted on January 11, 1996. At that

hearing, the Immigration Judge made the same ambiguous statement to Jacinto.

Q. At this hearing you do have the right to be represented by an attorney at no expense to the Government or you may speak for yourself. I note that you are present today without an attorney. Do you wish to speak for yourself?

A. Yes.

Admin. R. at 47–48.

Jacinto's confusion immediately surfaced when the court asked if Jacinto intended to introduce documentary evidence in support of her application. The record indicates that Jacinto did not comprehend the nature of the evidence that was requested:

Q. All right. Very well. At these hearings you also have the right to present any documentary evidence in support of your claim for asylum. Do you have any documents that you wish to submit at this time in support of your case?

A. Documents for, yes, I think I have some right here.

Q. Okay.

A. No.

Admin. R. at 48. Jacinto produced no documentary evidence at this time but offered to present documentary evidence later in the hearing. *See* Admin. R. at 60. When Jacinto did offer to show the Immigration Judge such evidence in the form of photographs, the judge stated that it was not necessary to view them. *See id.* He thus denied her the opportunity to present evidence that could have been relevant to her application, particularly given his finding that she was not credible.

The manner of conducting the asylum hearing placed Jacinto at a considerable disadvantage. The asylum hearing in this case began with the Immigration Judge asking preliminary questions. Rather than permitting Jacinto to present her own testimony, the Immigration Judge then turned questioning over to the INS attorney. The questioning of Jacinto then alternated between the Immigration Judge and the INS attorney. At no point was she afforded the opportunity to present her own affirmative testimony, in narrative form or otherwise.

We also observe that the Immigration Judge's initial questioning concerned Jacinto's family background, but completely omitted any questions that would have determined whether she possessed the experience that would enable her to comprehend the proceedings at hand. Some questioning proceeded like a cross-examination without giving Jacinto an opportunity to fully explain or elaborate on her testimony. Here is an example:

Q. [INS attorney] Let's start from the beginning. You stated that Mr. Lopez had problems in Guatemala, by the Guatemalan army, is that correct.

A. Yes, he worked there. I'll explain. He—

Q. Ma'am, I'm going to ask you some questions, try to answer these (indiscernible) in an organized way. Okay. When did Mr. Lopez, if you know, become a member of the Guatemalan army?

Admin. R. at 53.

The Immigration Judge, in the questioning of Jacinto, focused on a number of matters where Jacinto did not fully respond. During questioning of Jacinto by the INS attorney, the Immigration Judge would interrupt frequently and ask questions and then turn the questioning back to the government attorney. The examination of Jacinto went back and forth between the Immigration Judge and the government attorney with some of the questions relating to the credibility of Jacinto's statements. For example, the following colloquy occurred between the INS attorney and Jacinto:

Q. Ma'am, if they came to your house so often, and you were so afraid, why did you stay there for two years?

A. In the house?

Q. Why didn't you leave Guatemala earlier?

A. It's that we, they started, like I said, they started to bother us because he told them if they continued [to] bother him he was going to say everything he knew because he knew all the bad things that they did. That's when they started to persecute him to kill him.

Q. See, but, ma'am, please answer my question. If you were so afraid of these people and they were bothering you so often, why did you wait two years to leave Guatemala?

A. I did not wait that long. They threatened him, but they did not bother me, just at the end that they would come and bother me.

Admin. R. at 68.

At the end of the examination on the merits, the Immigration Judge did not afford Jacinto any opportunity to explain her answers, but turned to the government counsel and inquired, "Anything further, counsel?" Admin. R. at 69.

At that point counsel indicated that he wished to inquire about voluntary departure. However, at no time did the Immigration Judge explain that Jacinto could testify further with respect to the asylum claim, could explain or add to her previous answers, or offer additional evidence. Thus, Jacinto was never at any time given the opportunity to present directly, or fully detail, her account supporting her claim for asylum.

After the government completed its inquiry relating to voluntary departure, the court called Jacinto's only witness, Francisco Javier Lopez. Lopez made some statements that one might deem to be harmful to the cause of the petitioner. For instance, he stated that initially Jacinto wanted to return to Guatemala until recently when he convinced her that it would be dangerous for her to return and that the family should stay together.

After the Immigration Judge and the INS attorney finished questioning Lopez, the Immigration Judge asked Jacinto the following:

Q. To the Respondent, do you have any questions that you would like for the witness to answer?

A. No.

Admin. R. at 84.

The Immigration Judge did not explain to Jacinto that she could use this opportunity to clarify any matters, dispel any conclusions, highlight certain facts, or present additional evidence supporting her right to remain in the country. For instance, Jacinto never asked Lopez to further expound upon his statement that he knew of several instances of killings of Guatemalan citizens by the Guatemalan army. Jacinto failed to amplify this matter, and there is no indication that she recognized the importance of showing a political motivation for the adverse action taken against her and Lopez while in Guatemala that served as the reason to leave Guatemala.

The duties of the immigration judge have been suggested in *Fisher v. INS*, 79 F.3d 955, 972 (9th Cir.1996) (en banc) (Noonan, J., dissenting). While the en banc court did not discuss the specific duties of the immigration judge, Judge Noonan outlined those duties as provided in the federal statute at that time.[4]

By statute, the immigration judge "shall administer oaths, receive evidence, and interrogate, examine, and cross-examine the alien and any witnesses." 8 U.S.C. § 1229a(b)(1). Moreover, the UNHCR's Handbook on Procedures and Criteria for Determining Refugee Status under the Refugee Convention, which the asylum statute implements, states that "the duty to ascertain and evaluate all the relevant facts is shared between the applicant and

---

4. In 1996, 8 U.S.C. § 1252(b) provided that the immigration judge "shall ... determine the deportability of any alien, and shall administer oaths, present and receive evidence, interrogate, examine, and cross-examine the alien or witnesses." Later that year, Congress amended the Act, but the language of section 1252(b), recodified as section 1229a(b)(1), remains substantially the same.

the examiner" such that the role of the asylum adjudicator is to "ensure that the applicant presents his case as fully as possible and with all available evidence." Handbook, para. 196; 205(b)(i).[5]

In *Fisher*, Judge Noonan noted that the statutory and regulatory obligations required, in short, the immigration judge to fully develop the record. Reciting the statutory and regulatory mandates of the immigration judge, Judge Noonan observed that the duty of the immigration judge is analogous to that of the administrative law judge in social security disability cases. In social security disability cases, the administrative law judge has a duty to "fully and fairly develop the record...." *Brown v. Heckler*, 713 F.2d 441, 443 (9th Cir.1983). We agree.

Both administrative settings have the common feature of determining the applicant's eligibility for certain benefits. The benefit sought in social security disability cases is, of course, monetary. The benefit sought in deportation hearings is the permission of the United States government for the alien to stay in the United States because the individual has suffered past persecution or has a well-founded fear of persecution in her homeland.

In addition, both social security and deportation hearings are likely to be unfamiliar settings for the applicant, and, as the Supreme Court has noted, such procedures "should be understandable to the layman claimant ... and not strict in tone and operation." *Richardson v. Perales*, 402 U.S. 389, 400, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). When an applicant appears pro se, this rationale is all the stronger, and the administrative law judge must "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts. [The judge] must be especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited." *Key v. Heckler*, 754 F.2d 1545, 1551 (9th Cir.1985) (citations omitted).

While the rationale for full development of the record in social security cases lies in the non-adversarial nature of the proceedings, see *Wilcutts v. Apfel*, 143 F.3d 1134, 1137 (8th Cir.1998), the rationale in deportation proceedings is at least as important.

Like in social security cases, applicants for asylum often appear without counsel and may not possess the legal knowledge to fully appreciate which facts are relevant. Yet a full exploration of all the facts is critical to correctly determine whether the alien does indeed face persecution in their homeland. Thus, in such circumstances, the immigration judge is in a good position to draw out those facts that are relevant to the final determination.

Further, aliens often lack proficiency in English, the language in which the proceedings are conducted typically. Despite the presence of a translator, the language barrier presents the potential to affect the ability of the alien to communicate and the ability of the immigration judge to understand what is being stated.

Moreover, while the proceedings are adversarial in nature, the implication of the proceedings is that an individual is required to leave this country. Thus, the petitioner could face a significant threat to his or her life, safety, and well-being. Should the immigration judge fail to fully develop the record, information crucial to the alien's future remains undisclosed.

5. Although not binding, the UNHCR Handbook provides persuasive authority for courts determining what procedures are appropriate for conducting asylum hearings. "[The Handbook] has been cited by the Supreme Court as providing significant guidance for construing the United Nations Protocol Relating to the Status of Refugees, 19 U.S.T. 6223, T.I.A.S. No. 6557, to which the United States is a party and which Congress relied on in enacting United States refugee law." *Chanco v. INS*, 82 F.3d 298, 301 n. 2 (9th Cir.1996); citing *INS v. Cardoza–Fonseca*, 480 U.S. 421, 438–39, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987).

■ Thus, under the statute and regulations previously cited, and for the reasons we have stated here, immigration judges are obligated to fully develop the record in those circumstances where applicants appear without counsel, as is this case.

In this case, Jacinto represented herself under circumstances in which the court did not clearly explain either that she had the right to testify even if she was represented by a lawyer or that she could present evidence, in the form of affirmative testimony, even while representing herself. Thus, not only did she not have the assistance of counsel, but she suffered because her rights were not adequately outlined for her. Her testimony was the product of an examination conducted by parties somewhat adverse to her position. Further, and perhaps most important, the Immigration Judge never gave her the opportunity to present her own additional narrated statement that might have added support to her claim. These combined failures resulted in a denial of a full and fair hearing.

■ The lack of a full and fair hearing, however, will not alone establish a due process violation. The alien must establish that she suffered prejudice. *See Campos–Sanchez v. INS,* 164 F.3d at 450. Prejudice is apparent and pervasive in this case as demonstrated by an examination of the Immigration Judge's determinations regarding credibility and by the testimony relating to voluntary departure.

It was important for Jacinto to establish that her persecution or her well-founded fear of persecution rested on one of these factors: race, religion, nationality, membership in a particular social group or political opinion. 8 U.S.C. § 1101(a)(42)(A). However, this was not developed in the proceedings because the Immigration Judge never explained this requirement to her, and never gave her an opportunity to testify fully in her own behalf. Instead, Jacinto only was permitted to "testify" through an examination conducted by the Immigration Judge and the INS attorney.

Interestingly, the Immigration Judge observed "the Respondent herself did not know the reason why these individuals were actually after her husband." Admin. R. at 26. Yet it appears from the record that Jacinto's husband, Lopez, indicated they had information that members of the military were involved in murders of other persons. Had the Immigration Judge attempted to elicit more information from Lopez on this subject, the questions could well have led to some additional information about the relationship between military abuses and political opinions that would have lent support to Jacinto's application.

Perhaps not surprisingly, the Immigration Judge did not believe some of Jacinto's testimony. Yet, with further information, the credibility issue might have been resolved differently. The Immigration Judge's disbelief of Jacinto's testimony is reflected in portions of the record as follows:

> The Court believes that if members of the Guatemalan military truly wanted to harm the witness, that they would have had ample opportunity to do so and could have done so, yet they did nothing to him for a period of two years.

> . . . . .

> The Court finds it difficult to believe that the Respondent would have remained in Guatemala for a period of almost two years if she truly feared for her life and the lives of her family.

> . . . . .

> The Court finds that the Respondent's testimony during the course of these proceedings has been very evasive. The Court, as well as the trial attorney, asked the Respondent numerous questions and the Respondent failed on several occasions to answer the questions specifically.

Admin. R. at 27–28. These matters might have been better resolved if Jacinto had received the necessary information about

her right to present her own direct narrative testimony in explanation of her circumstances in Guatemala.

More than that however, Jacinto's inability to understand the hearing process and the questions presented to her from the Immigration Judge is reflected in the dialogue concerning voluntary departure. The record shows that Jacinto did not understand her privilege of a voluntary departure. The Immigration Judge questioned Jacinto as to whether she would agree to depart voluntarily should her asylum application be denied. In response, Jacinto replied, "I'm afraid to go over there," "I'm afraid to return to my country." Admin. R. at 70. The Immigration Judge continued:

Q: All right, ma'am, so, are you saying that if I do grant you a period in which to leave voluntarily, you will not leave. Is that what you're saying?

A: If you give me permission?

Q: To leave voluntarily, would you leave?

A: I don't know where I would go, but not to Guatemala.

Q: Well, you could go wherever you wanted to go, but you could leave, you would have to leave the United States.

A: How's that?

Q: You would have to leave the United States. You would not have to go back to Guatemala, but you would have to leave the United States. Are you willing to do that, yes or no?

A: No. I cannot answer that question.

Admin. R. at 71.

Jacinto's desire to depart voluntarily should her asylum application be denied is obvious from the fact that she applied for voluntary departure in the first instance. Despite the clear advantage in agreeing to voluntarily depart, Jacinto repeatedly stated that she would not go back to Guatemala. Her responses to the Immigra-

tion Judge's questioning, and her failure to supplement the adverse inferences against her in the record as developed by the Immigration Judge and the INS attorney demonstrate that Jacinto did not understand the procedures in which she was engaged or the implications of her answers. These examples are sufficient to demonstrate that Jacinto suffered prejudice not only as to the issue of voluntary departure but as to the merits as well.

We do not decide the merits of Jacinto's application for asylum. We hold only that Jacinto did not receive a full and fair hearing, that she suffered prejudice, and thus was denied due process. Accordingly, we VACATE the Board's decision, and we REMAND the case to the Board with instructions to remand to the Immigration Judge for a new hearing consistent with this opinion.[6]

TROTT, Circuit Judge, Dissenting:

I respectfully disagree with the majority opinion's conclusions (1) that Jacinto did not receive a full and fair hearing, (2) that the immigration judges failed in their responsibilities, (3) that Jacinto did not understand her rights with respect to the hearing procedure, (4) that she was denied a reasonable opportunity to present evidence, and (5) that she was the subject of two cross-examinations. Thus, I conclude that she was not denied due process.

Before the hearings, Jacinto received written notice of her rights. Then, on August 24, 1995, *after* her son's right to an attorney was explained, I.J. Martin asked, "Do you understand all that I've said so far, Ms. Jacinto Carillo?" Answer, "Yes." When she said she wished to speak for her son at the initial deportability hearing, the I.J. explained her son's rights—to present evidence in his own behalf, to examine and object to evidence, and to question any witnesses. He asked her, "Do you understand the rights that your son enjoys?"

---

6. Because Jacinto received representation from counsel on this appeal, we assume on remand that she will have the assistance of an attorney.

Her answer was, "Yes." At the same hearing, the I.J. told her that she had the same rights as did her son, including the rights to an attorney and to present evidence on her own behalf. He said, "The same thing applies to you. Do you understand?" Her answer was, "Yes." At the end of that hearing, the I.J. again asked, "Do you understand all that I've said?" Her answer was, "Yes, Your Honor." Then, she had over four months to get ready for the hearings.

At the January 11, 1996, asylum hearing, she was again given an opportunity to have a lawyer, but she chose "to speak for herself." She submitted documents on her behalf and called a witness, Francisco Lopez, who made her case.

Where I do agree with the majority opinion is on its conclusion that Jacinto did not understand voluntary departure. But I cannot in good conscience fault the I.J.s for depriving this petitioner of due process. The I.J. presiding at the asylum hearing was *helping* her. If he had simply said, "Okay, your case, go ahead," I think we would fault the I.J. for throwing Jacinto to the wolves.

Accordingly, I would restrict the remand in this case to the issue of voluntary departure.