NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued February 22, 2007
Decided March 14, 2007

**Before**

Hon. RICHARD D. CUDAHY, *Circuit Judge*

Hon. KENNETH F. RIPPLE, *Circuit Judge*

Hon. DIANE P. WOOD, *Circuit Judge*

No. 06-2114

| | |
|---|---|
| YONATHAN W. HERDIANSYAH,<br>  *Petitioner*, | Petition for Review of an Order of the<br>Board of Immigration Appeals |
| *v.* | No. A78 020 339 |
| ALBERTO R. GONZALES, Attorney<br>General of the United States,<br>  *Respondent*. | |

**O R D E R**

Yonathan Herdiansyah, a national of Indonesia, applied for asylum, withholding of removal, and relief under the Convention Against Torture (CAT), based on his Christian faith and Chinese ethnicity. The Immigration Judge (IJ) denied his asylum application as untimely and denied his requests for withholding of removal and relief under CAT on the merits; the Board of Immigration Appeals (BIA) affirmed. Herdiansyah now petitions for review, arguing that the IJ violated his rights to procedural due process and to be represented by counsel, and that substantial evidence does not support the denial of his applications for asylum and withholding of removal. We deny the petition.

# I

Herdiansyah entered the United States as a visitor in June 2001, but he did not leave when he should have. Instead, he remained and avoided the attention of the immigration authorities until the government instituted the National Security Entry Exit Registration System, which is a program requiring certain aliens to register with the Department of Homeland Security (DHS). See *Hadayat v. Gonzales*, 458 F.3d 659, 661 (7th Cir. 2006). As he was required to do, Herdiansyah registered in March 2003. This action, not surprisingly, led to DHS's discovery that his presence in the country was unauthorized. DHS accordingly served him with a Notice to Appear but left the court's location and the date of his initial hearing to be set later. The notice, however, was not addressed properly, and so Herdiansyah never received it. When he did not appear for his hearing (which was in Los Angeles), the IJ ordered him removed *in absentia*. Some time later, Herdiansyah learned about the removal order and retained an attorney, who moved to reopen the case. The IJ granted that motion.

Herdiansyah then appeared for an initial hearing in July 2003, where, represented by counsel, he conceded removability and expressed his intention to apply for asylum, withholding of removal, and relief under CAT. The IJ continued the case until September 2003. The IJ also asked counsel to "advise [Herdiansyah] of the consequences of failing to appear and waive my reading." It is not clear to what "reading" the IJ was referring, but counsel agreed to the request.

In September 2003, Herdiansyah filed his asylum application with the court, contending that he feared persecution based on his Christian faith and Chinese ethnicity, though he recounted no specific instances of past persecution. He supported his application with several newspaper articles from 2000 to 2002 discussing attacks on Christians in Indonesia, including the bombings of Christian villages and churches. His case was set for a merits hearing, and counsel once again "waive[d] [the IJ's] reading."

At the August 2004 merits hearing, before anything of substance occurred, counsel advised the Los Angeles immigration court that Herdiansyah wanted to transfer his case to Chicago. Herdiansyah told the IJ that he had moved to Chicago in April and that potential witnesses for his case were in the Chicago area. The IJ granted the motion, which was unopposed. At this hearing Herdiansyah also submitted more documents in support of his application, including a letter from a church official in Indonesia stating that as a "dedicated evangelist" Herdiansyah had "ministered" while there, and a certificate showing that the Pentecostal Church in Indonesia had ordained him two months before he left for the United States. Finally, the IJ allowed Herdiansyah's attorney to withdraw from the case. The judge warned Herdiansyah to "find an attorney [in Chicago] to assist you. Don't delay."

Herdiansyah did not heed this advice. He showed up at his October 2004

preliminary hearing before the Chicago immigration court without an attorney, although he told the IJ that he was looking for one. (In the eventual order denying relief, the IJ stated that at this October hearing Herdiansyah "was again explained his rights through counsel." The trial transcript confirms, and the government concedes, that this is an error: Herdiansyah appeared *pro se* at this hearing.) The IJ set the merits hearing for December 2004, and explained that he would "speak to [Herdiansyah] further about [his] case" then.

In December 2004, Herdiansyah once again appeared without counsel. The IJ stated – inaccurately – that at the previous hearing he had informed Herdiansyah of his "right to be represented by an attorney at [his own] expense and that if [he] could not afford a private attorney there were legal aid[] organizations that represent people at little or no charge." (No such explanation appears in the transcript of the October hearing, and the government does not contend that the IJ advised Herdiansyah off the record.) After confirming that Herdiansyah did not have a lawyer, the IJ announced that he was "going to go over" Herdiansyah's application to determine his eligibility for relief. Responding to the IJ's questioning, Herdiansyah testified that he came to the United States because incidents in Indonesia made him "terrified." He explained that in 1998, three years before he entered the United States, rocks were thrown into his house, and that at some later date (he did not say when) he saw a woman get shot. Herdiansyah did not explain who the perpetrators were in either incident or what motivated them. He also testified that his church was shut down for two months in 1998, but he was not asked, nor did he offer to explain, why the closure occurred. Herdiansyah added that, although the Indonesian government had not prohibited him from practicing his religion, Muslim groups effectively did. Nothing about these events had been disclosed previously in Herdiansyah's written submissions or during his personal appearances before the immigration courts.

The IJ then gave Herdiansyah a copy of the 2004 Department of State Report on International Religious Freedom in Indonesia, which notes "advances in interreligious tolerance and cooperation," and admitted the report into the record. Acknowledging that terrorist attacks continued in Indonesia, the IJ nonetheless observed that the government had not prevented Herdiansyah from "practicing his religion or placed restrictions on his practice." After expressing his inclination to rule against Herdiansyah, the IJ asked, "[I]s there something else you want to tell me about your case that you haven't already told me?" Herdiansyah responded that Christians and people of Chinese ethnicity still faced discrimination in Indonesia, but he offered no further supporting evidence or witnesses.

The IJ found Herdiansyah's asylum application untimely because he had filed it almost two years after his entry (*i.e.* almost a year late) and no extraordinary circumstances justified that delay. Alternatively, the IJ concluded that Herdiansyah fell "far short" of the asylum standard because he suffered no personal harm in Indonesia and did not face a well-founded fear of future persecution. Because

Herdiansyah failed to meet the asylum standard, the IJ also denied his request for withholding of removal.

Less than a month later, Herdiansyah retained counsel to assist in his appeal to the BIA. In the statement of facts in his brief to the BIA, counsel included the observation that "it was not clear whether Respondent has waived his right to have any attorney represent him." But in the argument section of the brief, counsel said nothing about Herdiansyah's right to counsel. Instead he argued that Herdiansyah was prevented from filing his asylum application earlier because his son was in a serious car accident in July 2003, and that this circumstance excused his untimely filing. He also argued that the IJ had violated Herdiansyah's right to due process by conducting only a brief hearing and by introducing the Department of State report the same day he rendered his decision. On the merits, counsel argued that Herdiansyah was eligible for either asylum or withholding of removal.

The BIA dismissed the appeal. It agreed with the IJ that no extraordinary circumstances had prevented Herdiansyah from filing his asylum application within the one-year period required by the statute. In addition, the Board agreed with the IJ that Herdiansyah in any event could not meet the standards for any of the forms of relief he had requested. Last, it concluded that there were no "improprieties or deficiencies" in the way that the IJ conducted the merits hearing and that Herdiansyah accordingly suffered no violation of his right to due process. Referring to the agreement of Herdiansyah's lawyer in Los Angeles to waive the IJ's "reading," the BIA also noted that Herdiansyah had "waived the explanation of his rights" but did not specify what explanation it was talking about.

## II

Herdiansyah retained a new lawyer for this petition for review. In this court he contends that the IJ in Chicago violated his statutory and constitutional right to counsel by failing to apprise him of this right and by proceeding to the merits of his case without securing a waiver. Before this court can consider this point, however, we must assure ourselves that Herdiansyah properly presented it to the BIA. See 8 U.S.C. § 1252(d)(1); *Korsunskiy v. Gonzales*, 461 F.3d 847, 849 (7th Cir. 2006); *Mireles v. Gonzales*, 433 F.3d 965, 968 (7th Cir. 2006). Arguments about due process are no exception to this rule, because it is often true that the BIA has the power to remedy the particular procedural flaw the alien has identified. *Pjetri v. Gonzales*, 468 F.3d 478, 481 (7th Cir. 2006); *Feto v. Gonzales*, 433 F.3d 907, 912 (7th Cir. 2006).

We note, at the outset, that Herdiansyah is really arguing (or should be arguing) that the IJ failed to give effect to his statutory right to counsel, found in 8 U.S.C. §§ 1229a(b)(4)(A) and 1362, and implemented in 8 C.F.R. § 1240.10(a). Although an alien has a general right to due process in immigration proceedings, see *Feto,* 433 F.3d at 912; *Hasanaj v. Ashcroft,* 385 F.3d 780, 783 (7th Cir. 2004), and that right may

include a right to counsel, the scope of such a right is far from clear. Compare *Jacinto v. INS,* 208 F.3d 725, 734 (9th Cir. 2000) (finding a constitutional right), with *Stroe v. INS,* 256 F.3d 498, 500-01 (7th Cir. 2001) (questioning whether such a right exists). In this case, as in *Stroe*, we need not resolve these questions. No matter what, Herdiansyah had a duty to exhaust his claim before the BIA, because the BIA could have fixed any problem with the application of the statute or regulation.

Although Herdiansyah insists that his previous lawyer raised the right-to-counsel issue before the BIA, the brief that prior counsel filed with the BIA demonstrates otherwise. In that brief, prior counsel expressed uncertainty about whether Herdiansyah had waived his right to counsel, noting that "it was not clear whether [Herdiansyah] has waived his right to have any attorney represent him." Aside from this rather vague comment, counsel never argued that the IJ violated Herdiansyah's right to counsel by failing to obtain a waiver, nor did counsel cite any statutes, regulations, or cases discussing an alien's right to counsel. Counsel argued generally that the IJ had denied Herdiansyah due process, noting the IJ's purported failure to develop the case, the IJ's reliance on the Department of State report, and Herdiansyah's limited opportunity to review the report. Because Herdiansyah failed to exhaust his administrative remedies, this court cannot review his argument that he was denied his right to counsel. (We note in any event that the record shows that Herdiansyah knew something about his right to representation, because he had counsel before the Los Angeles immigration court, the BIA, and now this court. The Los Angeles judge urged him to find counsel in Chicago. The worst that can be said is that the Chicago IJ neglected to give him the list of organizations that provide free legal help, but no case has come close to saying that the Constitution itself requires that step.)

Herdiansyah also argues that he was never informed, as he should have been, that he could present evidence, cross-examine witnesses, and examine and object to the evidence against him at his removal hearing. See 8 C.F.R. § 1240.10(a)(4). Indeed, neither of the IJs involved in Herdiansyah's case advised him of these rights, but this apparent failure may stem from prior counsel's waiver of the "reading" in Los Angeles. In responding to Herdiansyah's argument that he was unprepared to object when the Chicago IJ surprised him with the Department of State report, the BIA concluded that Herdiansyah's counsel in Los Angeles "waived the explanation of his rights." As noted above, the scope of the "reading" that was waived is unclear, but the BIA took the position that it encompassed at least the explanation of the right to examine and object to evidence. Nothing in the record before this court sheds any light on the matter.

Even if counsel in Los Angeles did not waive the reading of these rights, this omission would not justify granting Herdiansyah's petition. All of the rights are listed in the Notice to Appear, which Herdiansyah received in person before his very first appearance in Los Angeles, and he has never said – either here or before the BIA – that he lacked actual knowledge of his rights before or at the merits hearing in

Chicago. Furthermore, Herdiansyah has not identified any evidence that he was prevented from presenting. He cites various articles reporting continued violence in Indonesia, but these articles were before the IJ. He suggested during one of his appearances in Los Angeles that he might call witnesses to testify on his behalf, but he has never named these potential witnesses or explained what testimony they would have given. The record shows that the IJ made efforts to elicit testimony from Herdiansyah by asking him open-ended questions regarding any past persecution he faced and his fear of returning to Indonesia. In fact, it is only because of the IJ's questioning that there is anything at all in the record about Herdiansyah's experiences in Indonesia.

Although the hearing was brief (the transcript spans only 19 pages), Herdiansyah has not shown that this brevity affected his ability to present evidence. Because the government presented no witnesses, he could not have been harmed by any failure to advise him of his right to cross-examine. Even though the IJ introduced the Department of State report without allowing Herdiansyah to review it in advance and to object to it, before this court Herdiansyah has not identified any basis for objecting to the report. See *Niam v. Ashcroft*, 354 F.3d 652, 658-59 (7th Cir. 2004) (noting that Department of State reports are generally admissible). To the contrary, he finds support for his petition in the report, insofar as it includes details of continuing violence while at the same time recounting some improvement. Since the IJ acknowledged that sporadic attacks on Christians are still occurring, we see nothing to indicate that Herdiansyah's spin on the report would have altered the IJ's decision.

Herdiansyah's inability to say what he would have done differently if told about his statutory rights to present evidence, cross-examine witnesses, and examine and object to evidence also answers his argument that the IJ in Chicago violated his right to due process by conducting too brief a hearing. This court has held that an IJ violates an alien's right to due process if he prejudices the alien's case by barring "complete chunks of oral testimony that would support the applicant's claims." *Kerciku v. INS*, 314 F.3d 913, 918 (7th Cir. 2003) (per curiam). But here the IJ barred nothing; the hearing was short because Herdiansyah had nothing else to add.

Lastly, Herdiansyah argues that the IJ's denial of his applications for asylum and withholding of removal is not supported by substantial evidence. We have no jurisdiction, however, to review the asylum ruling. The IJ concluded, and the BIA agreed, that Herdiansyah was ineligible for asylum because no extraordinary circumstance excused his failure to file his application within one year of his entry. The fact that his application was filed more than a year after his entry is indisputable, and we have no authority to review the "extraordinary circumstances" determination. See 8 U.S.C. §§ 1158(a)(2)(B), (a)(2)(D), (a)(3); *Ikama-Obambi v. Gonzales*, 470 F.3d 720, 724 (7th Cir. 2006).

Applications for withholding of removal are not subject to a filing deadline, and so

timing at least does not stand in the way of our review. The government argues, however, that Herdiansyah failed to raise this point either before the BIA or in his opening brief to this court and thus that it is forfeited. We do not read his submissions so narrowly. In his brief before the BIA, Herdiansyah stated that he "has suffered past persecution and has a well-founded fear of future persecution" and maintained that he is "eligible for . . . withholding of removal." In his opening brief before this court, Herdiansyah closed his argument section by asserting that he "communicated his fear of returning, and also indicated that the source of his fear – persecution due to his faith and ethnicity – indeed existed." We are satisfied that this is enough to allow us to proceed.

This court reviews claims for withholding of removal using the substantial evidence standard. We will overturn the decision of the immigration courts only if the record compels a contrary result. *Mabasa v. Gonzales*, 455 F.3d 740, 745 (7th Cir. 2006). A showing that an applicant "'might' or 'could' be subject to persecution" is not enough. *Id.* Instead, an applicant "bears the burden of demonstrating that loss of life or freedom is more likely than not" if he returns to his home country. *Kobugabe v. Gonzales*, 440 F.3d 900, 901 (7th Cir. 2006).

The record does not compel a finding that Herdiansyah will more likely than not face persecution if he returns to Indonesia. At most, his evidence shows that there is still sporadic violence committed against the Christian minority by Muslim extremists. Even if this shows that he might be subject to persecution, that is not enough for withholding of removal, especially given the fact that the Department of State reports that the Indonesian government "generally respects" the right of Christians to worship and that violence between Christians and Muslims is decreasing. See *Firmansjah v. Gonzales*, 424 F.3d 598, 606-07 (7th Cir. 2005); *Margos v. Gonzales*, 443 F.3d 593, 599 (7th Cir. 2006). While many Chinese residents in Indonesia reported instances of discrimination and harassment, this alone does not entitle an applicant to withholding of removal. *Bucur v. INS*, 109 F.3d 399, 402 (7th Cir. 1997) ("[D]iscrimination is not persecution.)

Although proof of past persecution could imply a future threat, *see Kobugabe*, 440 F.3d at 901; 8 C.F.R § 1208.16(b)(1)(i), none of Herdiansyah's past experiences can be characterized as persecution. He never identified the perpetrators, let alone demonstrated that the violence was motivated by his Christian faith or Chinese ethnicity. See *Liu v. Ashcroft*, 380 F.3d 307, 312 (7th Cir. 2004). In addition, with respect to the closing of his church, he never explained how the government was implicated in that action. See *Hor v. Gonzales*, 400 F.3d 482, 485 (7th Cir. 2005) ("Persecution is something a *government* does, either directly or by abetting." (emphasis in original)).

Accordingly, we DENY the petition for review.