JUDITH E. LEVY, United States District Judge
Defendant Leopoldo Vargas-Molina was indicted for unlawful reentry under 8 U.S.C. § 1326(a). He filed two motions to dismiss the indictment, both of which go to the validity of his underlying removal order from 2011. Vargas-Molina relies upon § 1326(d) to collaterally attack that order. And in his second, he argues that the Immigration Judge ("IJ") lacked jurisdiction to conduct the removal hearing, rendering the order of removal void ab initio . For the reasons set forth below, Vargas-Molina's 2011 removal order is invalid. His first motion to dismiss is granted, and his second is denied as moot.
I. Background
Vargas-Molina is forty-nine years old. He is a native of Mexico and has resided in the United States for the better part of nineteen years. (ECF No. 32-6, PageID.160.) He has three children, all of whom live here in this country. (Id. at PageID.161-62.) Two are U.S. citizens. (Id. at PageID.162.) Vargas-Molina first came to the United States in 1994. (Id. ) He returned to Mexico for three years and then returned in 1997. (Id. at PageID.160, PageID.167.)
Thirteen years later, Vargas-Molina had his first contact with law enforcement. He received two citations in Tennessee on March 21, 2010. At 2:13 a.m., Vargas-Molina was cited by a Tennessee State Trooper for "simple possession of a sch[edule two]" substance, cocaine. (Id. at PageID.156.) The citation notes that Vargas-Molina was a passenger in a vehicle that was pulled over and that the police officer "observed [him] reaching down several times in the attempt to hide something." (Id. ) In a search that the driver consented to, the officer found two baggies of cocaine under the floor mat on the passenger side of the car. (Id. ) Then at 6:03 a.m. that same day, Vargas-Molina was ticketed by Brentwood *814 police officers in Williamson County, Tennessee for driving with a suspended license. (Id. at PageID.157.) In 2009, his license was suspended for "a[n] equipment violation and failure to provide insurance out of ... Michigan." (Id. ) A hearing in Tennessee was set for April 1, 2010, to address Vargas-Molina's two citations, and it is undisputed that he did not appear, resulting in an outstanding warrant for these citations. (Id. at PageID.156-57 (setting a hearing date for April 1, 2010); ECF No. 32-7, PageID.178; ECF No. 32-8, PageID.181.)
Almost a year later, Vargas-Molina was arrested by Customs and Border Patrol ("CBP") for unlawful presence in the United States, and he was detained by CBP on March 12, 2011. (Id. at PageID.176.) On March 21, 2011, he appeared with a group of other individuals via video conference from Calhoun County, Michigan before IJ Hacker in Detroit. (ECF No. 32-2, Disc 1, Track 1, beginning at 0:00.) Vargas-Molina's primary language is Spanish, and an interpreter was present (id. ), although it is unclear if the interpreter was in Detroit or present with the noncitizens in Calhoun County. During this hearing, IJ Hacker addressed the group, explaining that they were in deportation proceedings, that she would address them each individually, and that they have the right to hire an attorney. (ECF No. 32-2, Disc 1, Tracks 1-2.) She also stated that they have a right to present evidence, to question government witnesses, and to look at any evidence presented by the government, but she would ultimately decide what evidence could become part of the record. (ECF No. 39-1, PageID.336.) Finally, IJ Hacker informed each noncitizen that they could appeal her decision, and it appears that they may have received a document explaining how to do so.[1] (Id. ("The officer there will hand you a list which explains more about your rights to appeal[.] This document tells you generally how to appeal.").) Each noncitizen affirmed that he or she understood his or her rights and confirmed some basic facts about their citizenship, entries, etc. (ECF No. 32-2, Disc 1, Tracks 1-2; ECF No. 39-1, PageID.337-44.)
IJ Hacker proceeded to wind her way through the group, and when she addressed Vargas-Molina, she noted that he had an outstanding warrant but was eligible for cancellation of removal, a form of relief from removal. (ECF No. 39-1, PageID.346.) She explained what Vargas-Molina would have to show to receive this relief: that he was physically present in the United States since March 12, 2000, and that his "children would suffer exceptional ... hardship if [he] were to be deported." (Id. ) He confirmed that he would like to apply for cancellation of removal and received an application form. (Id. ) But IJ Hacker never raised voluntary departure with Vargas-Molina, which would soon become his primary claim for relief from removal. Although she raised voluntary departure as a possibility for other individuals in the group, she never explained the legal standard for voluntary departure; she simply granted it as to those two people. (ECF No. 32-2 ; Disc 1, Track 6, beginning at 1:00.)
On March 31, 2011, the hearing continued before IJ Nettles. (Id. at Disc 1, Track 7.) The audio recording of that hearing is available. (ECF No. 43, PageID.397.) Again, Vargas-Molina appeared remotely from Calhoun County Jail and an interpreter was present. (Id. ) He was not represented *815 by counsel. (Id. ) During the hearing, the defendant explained that he did not fill out his cancellation of removal application and needed more time to gather the information required by the application. (ECF No. 39-1, PageID.357.) IJ Nettles continued Vargas-Molina's case but warned him that he would only receive one more chance to complete his application or else she would consider it abandoned. (Id. ) She stated, "Alright [sic] sir, I am going to give you until April 7th for cancellation or the alternative is voluntary departure[.]" (Id. at PageID.358.) She said nothing else besides this passing mention of voluntary departure to Vargas-Molina.
On April 7, 2011, Vargas-Molina once more appeared remotely from Calhoun County Jail, an interpreter was present, and he was again unrepresented by counsel. (Id. at PageID.361.) He told IJ Nettles that he was still unable to fill out his application for cancellation of removal because he was waiting for his brother to get certain documents to him as "proofs." (Id. ) In response to her questions, he explained that he filled out the questions to the best of his ability but needed the documents to finish the application. (Id. at PageID.362-63.) After reprimanding Vargas-Molina for not having his brother read the contents of the documents to him over the phone, the IJ set his case for trial and gave him a week to finish his application. (Id. )
Then, IJ Nettles asked Vargas-Molina if he had filled out his fee waiver request, and the first of several confusing exchanges ensued:
IJ: Did you fill out the application sir?
IJ: The waiver? The application fee waiver, did you fill out the waiver request?
Defendant: Well, ah,
Defendant: If it is not filled in then I don't want to appeal anything.
IJ: I didn't ask you about an appeal sir,
The IJ then reiterated that she would set his case for trial and Vargas-Molina would have one more chance to fill out his application for cancellation of removal. (Id. at PageID.363-66.)
Then IJ Nettles asked if Vargas-Molina wanted her to set his case for trial and abandon his application for cancellation of removal on the spot. (Id. at PageID.366-67.) Vargas-Molina asked what would happen if he decided not to pursue his case, and IJ Nettles explained:
IJ: I would either order you removed, or if you can somehow demonstrate otherwise [sic] qualify for voluntary departure, I would, if you are eligible for it, I would give you voluntary departure, but you have to make arrangements from inside the jail to purchase your ticket.
Defendant: Okay, then I would like to get volunteered.
IJ: Alright [sic] sir, so at this point and time, you do not, do you want to file your cancellation application yes or no. I need you to answer me clearly.
(Id. at PageID.367.) Vargas-Molina, apparently confused by the IJ's terminology, responded:
Defendant: Yes, I want to cancel it.
IJ: No, sir when you say cancel it, you mean that you wish, you don't want to file it, you want to stop your case, you want to stop right now and just ask for voluntary departure? Is that what you mean?
Defendant: Yes, I would like to ask for voluntary departure if you can give it to me.
(Id. at PageID.367-68.) The IJ offered no other explanation of voluntary departure.
Then IJ then swore Vargas-Molina to tell the truth in a rapid-fire oath, and began to question him about his criminal history:
*816 IJ: Sir, have you ever been convicted of any kind of crime sir?
Defendant: Convicted, no, no.
IJ: What have you been arrested for? Or charged with?
Defendant: I have not been arrested.
IJ: For what?
Defendant: Yes, the police has stopped me, but I have not been arrested.
(Id. at PageID. 368-71.) Vargas-Molina truthfully stated that he had been stopped in Michigan because a tail light was out. (Id. at PageID.371.) He volunteered that he was "stopped in Tennessee also." (Id. ) The IJ asked why, and he explained that he was not driving, but the car was stopped because the driver crossed over the line. (Id. )
Then, the government attorney asked if he had been arrested for possession of cocaine and for driving on a suspended license, and again, Vargas-Molina honestly answered that he had not been arrested. (Id. at PageID.371-72.) After hearing these truthful answers, the government attorney stated that he "was under the impression that [Vargas-Molina] had an outstanding warrant for possession in Tennessee." (Id. at PageID.372.)
IJ Nettles then resumed her questioning, leading to a third point of confusion for Vargas-Molina. After reminding Vargas-Molina that he told her he was stopped in Tennessee, she told him that the government had run his fingerprints and "an outstanding warrant in Tennessee related to ... cocaine" came up. (Id. ) Vargas-Molina attempted to clarify, explaining, "[n]o one checked my fingerprints when we were stopped [in Tennessee]." (Id. ) IJ Nettles responded that Immigration officials ran his fingerprints (id. ), but there is nothing in the record that indicates that when the government ran his fingerprints in 2011 a warrant or an arrest came up (see ECF No. 32-4 ("Print Rapsheet Screen ... A search of the fingerprints on the above individual has revealed no prior arrest data.")).
The IJ continued to ask pointed, short questions, and Vargas-Molina continued to answer her questions truthfully.
IJ: Sir, are you sure that there was nothing to do with cocaine or they didn't say anything to you when you were stopped in Tennessee?
IJ: Anything?
Defendant: Well they gave me tickets.
IJ: For what, you are not answering my questions sir, and I know you are not.
IJ: Did anybody, did any of the police officer[s] mention anything to you about drugs of any kind, including cocaine when you were pulled over in Tennessee sir.
Defendant: That is to say that when they found that they ask me if it was mine.
IJ: So they found it in the car.
Defendant. Yes.
(Id. at PageID.373-75.) Vargas-Molina then explained that the officers found cocaine on the passenger side of the car, where he was seated, but that he told the officers that the drugs were not his. (Id. )
The IJ turned to what he had done to address the tickets. (Id. at PageID.376.) He truthfully explained that he had not returned to Tennessee because he did not have the money to do so, but he had retained a lawyer. (Id. at PageID.376.) The IJ asked, "So, did he tell you that it was taken care of?" and Vargas-Molina responded, "Yes, he told me he was trying to get everything in order." (Id. at PageID.376-77.) The IJ then abruptly stated that she would not grant him voluntary departure because he was not answering her questions honestly and because "[t]rying to take care of [the citations] and *817 taking care of [the citations] are two different things." (Id. at PageID.377.)
The IJ came back to Vargas-Molina's citation for simple possession of cocaine. Vargas-Molina again explained that he was cited because the officers thought the cocaine was his, but he tried to explain that it was not. (Id. ) Then, in a disturbing exchange, the IJ said, "Sir, you absolutely told the government attorney something that was not true when he asked you about it." (Id. at PageID.378.) The government attorney confirmed, "Correct, I asked him if he had ever been arrested for possession of cocaine." (Id. ) Then, the IJ said that Vargas-Molina would never have identified the basis of his cocaine citation, and so she had to "literally pull [the existence of cocaine] charges out of [him]." (Id. at PageID.37-80.) Then, she said "Sir, I know why you did that[.] Because you also, on your own said, they didn't take my fingerprints in Tennessee[.] You were thinking that there was no way they can prove that to me[.] That this charge[ ] existed[.] You just told me tickets." (Id. at PageID.380.) The IJ proceeded to list the ways that Vargas-Molina was untruthful. (Id. at PageID.380-81.) The record unambiguously shows that Vargas-Molina was never arrested or formally charged; his warrant was the product of his failure to show up in Tennessee state court to address his citations.
But the IJ continued, stating that "more importantly, sir ... [y]ou never even went back to see about that case[,] you had ignored outstanding tickets[.] And hiring an attorney does not resolve that." (Id. at PageID.381.) The IJ accused Vargas-Molina of being dishonest and then ordered him deported. (Id. at PageID.382.) She continued, "I don't believe you answered the questions that were asked today in such a way that you deserve to receive voluntary departure[.] I really believe I gave you an opportunity to tell me the truth ... and it is very unfortunate you chose not to do that." (Id. at PageID.382-83.) Vargas-Molina had not spoken, nor did IJ Nettles give him an opportunity to do so, until this point. She asked him if he understood her, and he said he did. (Id. )
Then IJ Nettles apprised him of his right to appeal:
IJ: Do you wish to appeal this order, or do you wish to accept my order deporting you to Mexico as final?
Defendant: No, I don't want to appeal anymore.
IJ: You want to end your case today, are you sure?
Defendant: Yes.
IJ: And you understand that once you give up your right to appeal this concludes your case and you will have a deportation order against you, do you understand that?
IJ: And do you understand that this concludes today's case, and once you waive your rights of appeal then it is a final deportation order against you, do you understand that?
Defendant: Yes.
(Id. at PageID.383.) Vargas-Molina was removed to Mexico on April 19, 2011. (ECF No. 32, PageID.123; ECF No. 32-7, PageID.177.) He was the sole caretaker of his youngest child. (ECF No. 32, PageID.131.)
Vargas-Molina returned to the United States in June 2011 (ECF No. 32-6, PageID.160), and on March 15, 2016, he was arrested and taken into custody by CBP on his way to work installing carpet. (ECF No. 32, PageID.131.) He "was released [to remain in the United States] due to Prosecutorial Discretion" because he "did not fall under any of the Department of Homeland Security's prioritized immigration levels."
*818 (Id. at PageID.178.) In May 2016, he applied for asylum.[2] (Id. ; ECF No. 32-6.)
Almost three years later, in January 2019, while Vargas-Molina's asylum application was pending,[3] Immigration and Customs Enforcement ("ICE") was attempting to locate a suspected "criminal alien." (ECF No. 32-8, PageID.181.) ICE agents pulled a van over because they had seen a person get into the van who matched their target's appearance. The person was Vargas-Molina, who ICE confirmed was not their criminal target. (Id. ) He was taken into custody nonetheless (id. ) and charged with illegal re-entry following removal in violation of § 1326(a) (ECF No. 1 ).
Before the Court are Vargas-Molina's two motions to dismiss the indictment pursuant to Federal Rule of Criminal Procedure 12(b)(1). (ECF Nos. 32, 33.) The first motion relies on § 1326(d) to attack the validity of his underlying removal action from 2011. (ECF No. 32.) Vargas-Molina argues that the entry of that removal order was fundamentally unfair because his removal hearing as conducted by the IJs violated his due process rights, which prejudiced him because he would have received voluntary departure otherwise, and that he did not knowingly waive his right to appeal his final order of removal. (ECF No. 32, PageID.110-14.) The second motion argues that IJ Nettles lacked the jurisdiction to enter his removal order because his notice to appear did not include a date and time as 8 U.S.C. § 1229(a)(1) requires.[4] He acknowledges that the Sixth Circuit rejected this argument in Santos-Santos v. Barr , 917 F.3d 486 (6th Cir. 2019), and raises it before this Court to preserve the issue for appeal. (ECF No. 33, PageID.184; ECF No. 39, PageID.324.) On July 7, 2019, a hearing was held and oral argument heard. The Court ordered supplemental briefing, which was filed in a timely manner. (ECF Nos. 40, 41.)
II. Legal Standard
Federal Rule of Criminal Procedure 12(b)(1) permits parties to "raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." Fed. R. Crim. P. 12(b)(1). A collateral attack under 8 U.S.C. § 1326(d) is such an issue. See United States v. Garcia-Echaverria , 374 F.3d 440, 445 (6th Cir. 2004). Collateral challenges under § 1326(d) are reviewed de novo on appeal. United States v. Martinez-Rocha , 337 F.3d 566, 569 (6th Cir. 2003).
III. Analysis
A noncitizen charged with illegal reentry under 8 U.S.C. § 1326(a) may only challenge the underlying removal order of his charge if he
demonstrates that (1) the alien exhausted any administrative remedies that may have been available to seek relief against the order; (2) the deportation proceedings at which the order was issued improperly deprived the alien of the opportunity for judicial review; and *819 (3) the entry of the order was fundamentally unfair.
United States v. Estrada , 876 F.3d 885, 887 (6th Cir. 2017) (quoting § 1326(d) ). Vargas-Molina argues that the entry of his removal order was fundamentally unfair because the IJs did not fully develop the record at his removal hearing and because his waiver of appeal was invalid, he is excused from satisfying § 1326(d)(1)-(2). Because the parties address the third element of § 1326(d) first and then move to the waiver issue, which subsumes the first two prongs of § 1326(d) in this case, the Court does the same.
A. Whether the Entry of the Removal Order was Fundamentally Unfair
Vargas-Molina argues that the entry of his removal order was fundamentally unfair because the IJ failed to develop the record regarding his voluntary departure claim during his removal hearing. "[A] defendant must show both a due process violation emanating from defects in the underlying deportation proceeding and resulting prejudice" to demonstrate his underlying removal order was fundamentally unfair. Estrada , 876 F.3d at 887 (citing cases). Vargas-Molina's due process rights were violated, and this violation prejudiced him.
1. Due Process Violation
"Noncitizens in removal proceedings have long been protected by the Fifth Amendment's guarantee of due process of law." Mendoza-Garcia v. Barr , 918 F.3d 498, 503 (6th Cir. 2019) (citing Yamataya v. Fisher , 189 U.S. 86, 101, 23 S.Ct. 611, 47 L.Ed. 721 (1903) ); Estrada , 876 F.3d at 887 ("Fifth Amendment guarantees of due process extend to aliens in deportation proceedings, entitling them to a full and fair hearing." (quoting Huicochea-Gomez v. INS , 237 F.3d 696, 699 (6th Cir. 2001) )). Such proceedings "visit[ ] a great hardship on the individual and deprive[ ] him of the right to stay and live and work in this land of freedom[.] Meticulous care must be exercised lest the procedure by which he is deprived of that liberty not meet the essential standards of fairness." Mendoza-Garcia , 918 F.3d at 503 (alterations in original) (quoting Bridges v. Wixon , 326 U.S. 135, 154, 65 S.Ct. 1443, 89 L.Ed. 2103 (1945) ). This includes "at a minimum, the due process rights of a noncitizen 'to make his case before the immigration authorities[,] ...to 'hire counsel' to do so," and in cases where the noncitizen appears without counsel, to have the IJ fully develop the record. Id. (citations omitted).
In Mendoza-Garcia , the Sixth Circuit explained,
it is the IJ's duty to fully develop the record. Because aliens appearing pro se often lack the legal knowledge to navigate their way successfully through the morass of immigration law, and because their failure to do so successfully might result in their expulsion from the country, it is critical that the IJ scrupulously and conscientiously probe into, inquire of, and explore all of the relevant facts.
Id. (quoting Al Khouri v. Ashcroft , 362 F.3d 461, 464-65 (8th Cir. 2004) ). Drawing from precedent addressing "the duty to develop the record in the context of social security hearings," the Court elaborated:
Noting the danger to claimants lacking counsel and familiarity with the hearing procedures, we explained: "To satisfy this special duty the administrative law judge must scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts. He must be especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited." Pro se noncitizens in removal proceedings likewise *820 lack familiarity with or comprehension of the complex system of immigration laws. We agree with our sister circuits that to provide a fundamentally fair proceeding, immigration judges are bound by the recognized duty to help pro se parties develop the record.
Id. at 504-05 (citations omitted) (quoting Lashley v. Sec'y of Health & Human Servs. , 708 F.2d 1048, 1052 (6th Cir. 1983) ).
In Agyeman v. INS , which is cited favorably by Mendoza-Garcia , 918 F.3d at 508, the Ninth Circuit explained that an IJ's duty to fully develop the record also requires the IJ to explain the procedures, the legal standards, and the types of affirmative evidence that the noncitizen may submit on his own behalf to "establish his basis for relief." Agyeman v. INS , 296 F.3d 871, 877, 884-85 (9th Cir. 2002) (citing Jacinto v. INS , 208 F.3d 725, 728 (9th Cir. 2000) ). This includes explaining that during the hearing, the noncitizen "could use this opportunity to clarify any matters, dispel any conclusions, highlight certain facts, or present additional evidence supporting [the noncitizen's] right to remain in the country." Jacinto , 208 F.3d at 732. In sum, an IJ has a general obligation to explain the legal proceedings and what a noncitizen can do to make their case and a specific obligation to give noncitizens a chance to present evidence and to ask questions to develop accurate facts, both favorable and unfavorable.
This is clear in Mendoza-Garcia, where the Sixth Circuit considered numerous factors to assess the IJ's efforts to develop the record, both general and specific. Although the IJ explained the process and legal standards of an asylum claim and "posed open-ended questions that could elicit relevant responses," this was insufficient to outweigh the Court's other concerns. Mendoza-Garcia , 918 F.3d at 507-08. The Court emphasized that the transcript showed that the noncitizen was confused, the IJ "rarely asked for clarification and moved quickly from topic to topic," the IJ never gave the defendant an opportunity to explain his credible fear as required by his asylum claim, and the IJ did not ask for specific information or examples about the source of the noncitizen's fear of returning to Guatemala. Id. The Sixth Circuit stopped short of finding a due process violation based on the IJ's failure to fully develop the record because the defendant could not demonstrate that this failure prejudiced him regarding his asylum claim, but the analysis is instructive.[5]
Vargas-Molina argues that the IJs did not fully develop the record because they failed to explain the legal process and standards of voluntary departure, including how he could have supported his application with evidence, and that IJ Nettles did not permit him to present affirmative evidence nor utilize her questioning to elicit accurate facts, favorable and unfavorable.
*821 Vargas-Molina is correct, and these failures violate his due process rights under the Fifth Amendment.
Unlike the IJ in Mendoza-Garcia , the IJs here did not fulfill their general obligation to explain the procedures, legal standards, and what types of affirmative evidence Vargas-Molina could have submitted to develop the record, specifically evidence of his positive qualities. Although IJ Nettles noted that he would need to purchase a plane ticket "from inside the jail," neither IJ explained the other statutory requirements to be eligible for voluntary departure, including that he had not been convicted of an aggravated felony or engaged terrorist activities. 8 U.S.C. § 1229c ; 8 C.F.R. § 1240.26(b)(1)(i)(E), (c)(1)(iii). They also would have told him that they must then weigh his positive and negative qualities, United States v. Valdez-Novoa , 780 F.3d 906, 917 (9th Cir. 2015) (citing Matter of Gamboa , 14 I. & N. Dec. 244, 248 (BIA 1972) ). Nothing in the transcript comes close to laying out these legal requirements. Even though IJ Hacker explained to the group that they could present evidence, ask the government witnesses questions, and examine the government's documents, neither IJ told Vargas-Molina that he could present evidence to demonstrate his positive qualities in support of his voluntary departure claim. They did not explain what such evidence might look like or give him a chance to do so. And although IJ Nettles questioned Vargas-Molina about his criminal history, presumably to assess his statutory eligibility and negative qualities, she never told him what she was doing and how it related to his claim for voluntary departure.
Second, IJ Nettles failed to live up to her obligation to allow Vargas-Molina to present evidence on his own behalf and to ask questions that elicit relevant facts-favorable and unfavorable. She did not ask any open-ended questions, nor did she ask clarifying questions that would have allowed Vargas-Molina to develop the record. IJ Nettles never stopped to confirm that Vargas-Molina understood her when he was confused about his fee waiver or about when his fingerprints were run. She also moved rapidly between topics, and the record reveals that as a result, Vargas-Molina was very likely confused or simply silent. Vargas-Molina was also not given a meaningful opportunity to clarify his responses, rebut her conclusions, or to speak at crucial points during the hearing. This is most apparent after IJ Nettles first says she will not grant him voluntary departure, and then proceeds at length to deliver her recap of the hearing, including that Vargas-Molina lied about being arrested and attempted to conceal his connection to cocaine by noting his fingerprints were not run in Tennessee. Notably, IJ Nettles did not ask any questions about Vargas-Molina's positive qualities.
While IJ Nettles questioned Vargas-Molina, she also introduced ambiguities in the record, made inaccurate factual conclusions, and determined that Vargas-Molina was dishonest, which was simply not true as confirmed by the documents she had available to review. For example, she made erroneous factual conclusions and failed to clarify ambiguities regarding his Tennessee citations. She concluded that Vargas-Molina lied when he said he had never been arrested and that he tried to obscure that his citation was for possessing cocaine. But the exhibits show that he has never been arrested.[6] IJ Hacker recognized *822 this; she accurately stated on the record at Vargas-Molina's first hearing that he had an outstanding warrant. Instead of obscuring the truth, he volunteered-in response to one of IJ Nettles' few open-ended questions, did he "have any other problems with police"-that he was stopped in Tennessee. He was truthful about the events of that stop, including the cause, that he received a citation, and what the citation was for. He also attempted to clarify that he was the passenger and the cocaine was not his. But because the questions were so narrow, and were presented so rapidly, Vargas-Molina was forced to explain what had transpired in a piecemeal fashion. He gave truthful, succinct answers in response to IJ Nettles' terse, targeted questioning. Nonetheless, the IJ determined that Vargas-Molina had lied, and she erroneously concluded at one point that he had been arrested for possession of cocaine. This is precisely why open-ended questions are preferred-they are more likely to provide accurate information than closed-ended questions.
The IJ also permitted ambiguities on the record as to whether Vargas-Molina was arrested, cited, or charged for driving without a suspended license and simple possession of cocaine. According to the transcript, the government attorney first asked whether Vargas-Molina had been arrested. Eventually, he said that he was under the impression there was a warrant out for his arrest. Throughout the transcript, the confusion between the IJ, the government attorney, and Vargas-Molina regarding arrests, stops, citations, warrants, and charges is obvious. Vargas-Molina continually states that he received tickets, but the IJ never clarifies what she perceives is lacking in his answers and uses the terms arrests, citations, warrants, and charges interchangeably. In the end, it is unclear if her determination was that Vargas-Molina was arrested, charged, cited or something else. Mendoza-Garcia notes the important function of questioning to elicit favorable facts, as well as unfavorable facts, and to clarify the record. That function was not fulfilled here.
At oral argument on this motion, the United States was unable to point to a single instance where IJ Nettles tried to elicit favorable facts or where Vargas-Molina lied. The Court asked the government no less than five times to point to a place in the transcript where IJ Nettles asked a question about a positive quality of Vargas-Molina's or allowed him to present affirmative evidence. Instead, the United States argued that due process is still afforded when an IJ exercises her discretion to conduct hearings in an "organized manner," which includes ending the proceeding when the noncitizen is unwilling to participate by being untruthful. But there is no indication that Vargas-Molina was not truthful or forthcoming. Crucially, this discretion does not negate the IJ's constitutional obligations as defined in Mendoza-Garcia to help unrepresented noncitizens fully develop the record at their immigration hearings, which at the very least includes telling the noncitizen at the outset that evidence of positive qualities is permissible and relevant.
When prompted to point to an instance where Vargas-Molina lied, the United States argued that Vargas-Molina lied when he said he was not arrested for his Tennessee stops because he could have been "unofficially arrested" and that no one knew if he was put in handcuffs, placed in a squad car, or taken to jail and then released. This is nothing but speculation. Whether the traffic stop ripened into an arrest is irrelevant because this Court, like IJ Nettles, can only operate upon the record before it. There is no indication in the record that Vargas-Molina was arrested *823 or that he had reason to think he was arrested. Moreover, the government did not explain how IJ Nettles could possibly have known Vargas-Molina was "unofficially arrested" so that she could make a finding that he lied when he said he was not arrested.
Next, the United States argued that the Court had no way to know whether Vargas-Molina was lying to his interpreter. Court interpreters swear an oath to accurately interpret what is being said during proceedings, and without evidence that the interpreter violated that solemn oath, this argument lacks any merit whatsoever.
Vargas-Molina's due process rights were violated more significantly than the noncitizen's in Mendoza-Garcia . There, the IJ gave basic explanations, asked open-ended questions, and said that the noncitizen would have a chance to speak. Here, the IJ failed to do any of those things and failed to question Vargas-Molina in a manner that could elicit relevant facts. IJ Nettles often spoke over the interpreter, failed to give Vargas-Molina chances to answer her questions before moving on, spoke quickly, and never confirmed that he understood her when he was confused about his fee waiver or when his fingerprints were run. See Jacinto , 208 F.3d at 730-32 (describing the IJ's failure to alleviate the noncitizen's confusion during the removal hearing and to give the noncitizen a change to present his story in narrative form, as well as the adverse effect of the IJ's frequent interrupting).
The United States offers one primary counterargument, which is that because the Sixth Circuit in Estrada held that a noncitizen has no right to be informed of their eligibility for discretionary relief,[7] there can be no due process violation based upon an IJ's failure to fully develop the record when the noncitizen seeks discretionary relief. This argument is unpersuasive. It is true that voluntary departure is a form of discretionary relief, Dada v. Mukasey , 554 U.S. 1, 8, 128 S.Ct. 2307, 171 L.Ed.2d 178 (2008), but Vargas-Molina's argument that his due process rights were violated by the IJ's failure to develop the record falls squarely within the holding of Mendoza-Garcia .
The only authority the United States points to is Estrada itself, but Estrada does not stand for this. There, the Court only held that there is no right to be informed of available discretionary relief.[8]
*824 Estrada , 876 F.3d at 887. Here, the issue is not whether Vargas-Molina was informed of the possibility of voluntary departure. As his hearing before IJ Nettles demonstrates, he was informed that he could be eligible for voluntary departure and he made a clear request to be considered for this relief. Instead, the issue is whether the record was adequately developed such that he had a full and fair hearing.
The government's reading of Estrada also conflicts with Mendoza-Garcia . As discussed above, the Sixth Circuit held that noncitizens have the right to a fully developed record, and the Court considered whether Mendoza-Garcia's record regarding his asylum claim was fully developed. Mendoza-Garcia , 918 F.3d at 502. Asylum is a form of discretionary relief, Marouf v. Lynch , 811 F.3d 174, 179-80 (6th Cir. 2016) (citing 8 U.S.C. § 1158(b)(1)(A) ), and the type of relief sought, mandatory or discretionary, is not mentioned in Mendoza-Garcia .[9] And because Mendoza-Garcia was decided after Estrada , the Sixth Circuit was certainly aware of Estrada 's holding. See also Mendoza-Garcia , 918 F.3d at 504-05 (noting that it was joining the majority of circuits, including the Eighth Circuit, which agrees with the Sixth Circuit that there is no right to be advised or informed of eligibility for discretionary relief, in holding that noncitizens have a right to a fully developed record in removal hearings).
Finally, the government's reading of Estrada runs counter to United States v. Mendoza-Lopez , 481 U.S. 828, 107 S.Ct. 2148, 95 L.Ed.2d 772 (1987). In Mendoza-Lopez , the Supreme Court determined that some form of meaningful judicial review of an administrative agency's determination is required when it forms an element of a criminal charge. 481 U.S. at 837-38, 107 S.Ct. 2148. There, the Supreme Court evaluated whether the noncitizens' hearings were fundamentally fair and whether their waivers of appeal of their suspension of deportation claims were valid. Id. at 830-31, 107 S.Ct. 2148. A suspension of deportation claim is a form discretionary relief, which the Supreme Court noted in that opinion. Id. at 831 n.3, 107 S.Ct. 2148. This holding was codified in § 1326(d) -the vehicle Vargas-Molina uses to challenge his 2011 removal order. See Copeland , 376 F.3d at 66. Nowhere does the Supreme Court suggest that due process concerns cannot arise when the relief sought is discretionary. Rather, it holds the opposite. Accordingly, Estrada does not stand for the proposition that no due process violation can originate from immigration proceedings where discretionary relief is at issue.
The United States failed to meaningfully address Mendoza-Garcia at oral argument and instead asserted that this Court was "wanting to find a due process violation in this case." This caused the Court significant concern. Our *825 federal government's system of checks and balances requires the judiciary to fairly and impartially administer the law. United States v. Hickman , 592 F.2d 931, 933 (6th Cir. 1979) ("[G]reat care must be taken by a judge to 'always be calmly judicial, dispassionate and impartial. He should sedulously avoid all appearances of advocacy as to those questions which are ultimately to be submitted to the jury.' " (quoting Frantz v. United States , 62 F.2d 737, 739 (6th Cir. 1933) ); see also 28 U.S.C. § 453 (codifying the judicial oath of office, which requires judges to "faithfully and impartially discharge and perform all duties incumbent upon [the judge] under the Constitution and laws of the United States."). This case, as any other, requires the Court to apply binding Sixth Circuit precedent to the facts before it. And, as discussed above, the Supreme Court has recognized that judicial review is constitutionally required when a "determination made in an administrative proceeding is to play a critical role in the subsequent imposition of a criminal sanction." Mendoza-Lopez , 481 U.S. at 837-38, 107 S.Ct. 2148. Consequently, in a case like this where a defendant seeks to collaterally attack his underlying removal order with the express permission of the Supreme Court and Congress, and where the Supreme Court directs courts to determine in a criminal case, where a defendant's liberty is at stake, whether any due process violation has transpired, this Court takes that duty seriously. Moreover, the questions posed to the United States were designed to explore whether such a violation has taken place. The undersigned was "looking for" nothing more than to understand the facts and the law that apply to this case.
Indeed, what is pertinent here is that Mendoza-Garcia held that an IJ has a duty to develop the record in all relevant respects. See 918 F.3d at 504, 507. Vargas-Molina abandoned his application for cancellation of removal, and so the only relevant issue in his removal hearing was his claim for voluntary departure. Even though there would be no due process violation if the IJ had not mentioned voluntary departure, she chose to do so and the defendant clearly stated his request to seek this relief, triggering her responsibility to scrupulously and conscientiously probe into the relevant facts. For these reasons, Vargas-Molina successfully demonstrates a due process violation based on the defects in his removal hearing.
2. Prejudice
"To prove prejudice, [a defendant] must show that his 'claims could have supported a different outcome.' " Mendoza-Garcia , 918 F.3d at 508 (citing Sako v. Gonzales , 434 F.3d 857, 864 (6th Cir. 2006) ; Jashari v. Sessions , 722 F. App'x 481, 493 (6th Cir. 2018) ). This showing is the same here as it is under the prejudice standards used in other circuits that have addressed this question. Id. at 508. It also mirrors the standard set forth in Strickland v. Washington , 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and Brady v. Maryland , 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Id. The Mendoza-Garcia Court cited Al Khouri s collection of "permissive prejudice standards" and noted the "reasonable probability" language in Strickland and Brady standards. Id. Therefore, the question is whether Vargas-Molina has shown that there is a reasonable probability that had the IJ fully developed the record, he would have received voluntary departure.[10] Vargas-Molina *826 can show prejudice due to the IJ's failure to explain the standards for voluntary departure, preventing him from presenting affirmative evidence or rebutting her conclusions regarding his negative qualities, and her failure to elicit accurate facts about his negative qualities which led to an unsupportable credibility determination. Independently and collectively, these grounds satisfy Mendoza-Garcia 's prejudice standard.
First, a defendant can satisfy prejudice by showing that the IJ failed to adequately explain the hearing procedures or elicit relevant facts. Al Khouri , 362 F.3d at 466 (quoting Agyeman v. I.N.S. , 296 F.3d 871, 884-85 (2002) ). Here, the IJ failed to explain the procedure and relevant legal and evidentiary requirements, and so Vargas-Molina never had a chance to present evidence of his positive qualities or rebut the IJ's conclusions about his negative qualities. If he had been given the opportunity, Vargas-Molina would have provided affirmative evidence, such as his "long residence here, close family ties in the United States, and Humanitarian needs," Matter of Arguelles-Campos , 22 I. & N. Dec. 811, 817 (BIA 1999). Indeed, Vargas-Molina has been physically present for ten years consecutively and nineteen years collectively, reflecting his substantial ties to the community (ECF No. 32, PageID.116, PageID.131); he has three children who live in this country; and he was the sole caretaker for his youngest child (id. at PageID.131). He also points to his work history as a carpet installer, demonstrating his work ethic and ability to remain employed. (Id. ) He also would have rebutted the IJ's conclusions about his criminal history by providing clarifying testimony as detailed above. Therefore, there is a reasonable probability that had the IJ set forth the standards and evidentiary requirements and given Vargas-Molina a chance to make his case, she would have granted him voluntary departure.
Second, Vargas-Molina can show that the IJ's questioning that led to inaccurate conclusions about his negative qualities harmed him because those conclusions formed the basis of an unsupportable credibility determination that he was dishonest. In Al Khouri , the Eighth Circuit found the defendant proved prejudice when the IJ inappropriately restricted the defendant's testimony. 362 F.3d at 467. There, the IJ told the defendant, "I'm going to elicit, that is bring out the information [ ] by questions and answers. I don't want you to tell me your whole life story, just answer one question ." Id. at 463 (emphasis in original). The court found the defendant was unable to develop the record due to the questioning because "the IJ did not ask questions that would have elicited all of the information." Id. at 467.
Vargas-Molina's testimony was similarly restricted by IJ Nettles' closed-ended questions, her failure to ask clarifying *827 questions, and her failure to elicit relevant and accurate information about his negative qualities, which would have at least mitigated the IJ's negative credibility determination. Based on the record before this Court, IJ Nettles' conclusion that Vargas-Molina was arrested was false, as was her statement that his "Print Rapsheet" indicated he had been arrested. (ECF No. 32-4, PageID.154.) His records with the Department of Homeland Security indicate he only had an outstanding warrant. (ECF No. 32-7, PageID.178.) This faulty credibility determination led the IJ to believe that Vargas-Molina's clarification that his fingerprints were not run in Tennessee was evidence of his effort to hide his cocaine citation from her and that he did not actually believe he had taken care of his citations by hiring a lawyer. In other words, the transcript coupled with other exhibits in the record show exactly how IJ Nettles' deficient questioning formed the basis of her assessment of his negative qualities and led to an unsupportable negative credibility determination. Again, Vargas-Molina satisfies prejudice.
Vargas-Molina can also demonstrate that he was prejudiced by the IJ's errors when considered collectively. The Court can reasonably predict how the IJ would have weighed his positive and negative qualities. Community ties can offset criminal records. See, e.g. , United States v. Ordonez , 328 F. Supp. 3d 479, 497 (D. Md. 2018) (finding a juvenile charge of assault was outweighed by the length of residence). And voluntary departure has been granted to noncitizens with significant criminal records. See, e.g. , In re Pineda-Castellanos , 2005 WL 3833024, at *1 (BIA Nov. 16, 2005) (granting voluntary departure when the defendant had six convictions, including battery). Vargas-Molina has an insignificant criminal history that does not include any arrests and certainly no violent arrests such as battery. Despite the warrant, he was released "due to Prosecutorial Discretion" by the Department of Homeland Security when he was detained on March 15, 2016.[11] (ECF No. 32-7, PageID.178.) Moreover, his long tenure in the United States outweighs his criminal history. And whatever negative credibility determination the IJ may still have drawn, it would have at least been significantly mitigated. Therefore, Vargas-Molina can show the IJ's failure to develop his record in support of voluntary departure prejudiced him because he would have received voluntary departure if the IJ had not made those errors.[12] ,[13]
In response, the United States again returned to Estrada at oral argument, arguing that because there can be no due process violation, there can be no prejudice. However, Estrada only held that noncitizens have no constitutional right to be informed of the availability of, receive, or be considered for discretionary relief. 876 F.3d at 888. The Sixth Circuit never moved beyond the due process component of the fundamental fairness inquiry. See id. at 889 ("Because we hold that Estrada has *828 not established a due process violation, we perceive no fundamental unfairness in the entry of his underlying deportation order."). This argument is also contrary to Mendoza-Garcia because the Sixth Circuit held that the noncitizen failed to make a showing of prejudice as to his specific claims during his removal hearing, not that prejudice was impossible to show because the relief Mendoza-Garcia sought was discretionary. 918 F.3d at 508-09.
At oral argument, the government pointed to Flores-Perez in support of its argument that Estrada prohibits a finding of prejudice where discretionary relief is at issue, 2019 WL 2929187, at *, 2019 U.S. Dist. LEXIS 112428, at *22, but this is unpersuasive. It is now redundant that Estrada goes no further than finding there is no due process violation where a noncitizen is not informed of his eligibility for discretionary relief. Moreover, Flores-Perez is nonbinding authority, and its discussion on prejudice in relation to Estrada is dicta because the Court found that the defendant had not met the first or second prongs of § 1326(d) or shown a due process violation before ever reaching prejudice. Id., 2019 WL 2929187, at *5-7, 2019 U.S. Dist. LEXIS 112428, at *14-22.
There is also no indication that a defendant cannot show prejudice because the relief he seeks depends on the IJ's subjective evaluation. E.g. , Mendoza-Garcia , 918 F.3d at 508-09 (analyzing prejudice); see also United States v. Almanza-Vigil , 912 F.3d 1310, 1324 (10th Cir. 2019) (rejecting the district court's statement that the "odds of receiving an act of grace in the form of discretionary relief present an inquiry too speculative for judicial examination"). This is consistent with Strickland and Brady , which permit a finding of prejudice when the jury, or court, make subjective, discretionary evaluations throughout trial.
Vargas-Molina shows that the IJ's errors prejudiced him because he showed there was a reasonable probability that if the IJ had properly developed the record, she would have granted his voluntary departure claim instead of ordering him removed. Accordingly, Vargas-Molina has shown that the entry of his removal order was fundamentally unfair.
B. Waiver of Appeal and Excusal of Exhaustion Requirement
Vargas-Molina does not dispute that he did not attempt to administratively exhaust or appeal the IJ's denial of his application for voluntary departure because he purportedly waived his rights to do so before IJ Nettles. Instead, he argues that his failures to do so should be excused because his waiver of his right to appeal is invalid.[14] Vargas-Molina raises two arguments in support of his argument: (1) he had no way of knowing upon what basis he had to justify his appeal because the record was not fully developed, and (2) his appeal would have been futile due to the underdeveloped record. Because Vargas-Molina succeeds on his first argument, the Court declines to address defendant's futility argument.
An unconsidered and unintelligent waiver excuses a defendant from satisfying *829 the first two requirements of § 1326(d), that the noncitizen administratively exhaust his remedies and that he was improperly deprived of judicial review. Martinez-Rocha , 337 F.3d at 569 (citing United States v. Sykes , 292 F.3d 495, 497 (6th Cir.), cert. denied , 537 U.S. 965, 123 S.Ct. 400, 154 L.Ed.2d 322 (2002) ); United States v. Hernandez-Ruiz , 716 F. App'x 534, 535 (6th Cir. 2018) (citing Martinez-Rocha , 337 F.3d at 569 ); United States v. Sosa , 387 F.3d 131, 136 (2d Cir. 2004) (discussing Mendoza-Lopez ); see Mendoza-Lopez , 481 U.S. at 840, 107 S.Ct. 2148 (holding that because the IJ permitted invalid waivers of appeal, the government could not "rely on those [removal] orders as reliable proof of an element of a criminal offense"). The noncitizen bears the burden of proving his waiver is invalid. See Martinez-Rocha , 337 F.3d at 566 (considering the noncitizen's evidence regarding the validity of his waiver). A district court's factual determination that a defendant's waiver was unknowing or involuntary is reviewed for clear error. Id. at 569 (citing Sykes , 292 F.3d at 497 ) (addressing waiver as an excuse to the administrative exhaustion requirement under § 1326(d)(1) ); see also United States v. Tamayo-Baez , 820 F.3d 308, 314 (8th Cir. 2016) (same); United States v. Cerna , 603 F.3d 32, 39 (2d Cir. 2010) (quoting United States v. Calderon , 391 F.3d 370, 375 (2d Cir. 2004) ) (same).
Although there may be little direct guidance on this issue, either in this circuit or in others, the waiver issue falls squarely under Mendoza-Lopez . After holding that judicial review of an underlying removal order in an illegal reentry case was constitutionally required, the Supreme Court went on to address whether the noncitizen respondents' hearings were fundamentally unfair and whether their waivers were valid. Mendoza-Lopez , 481 U.S. at 837-38, 107 S.Ct. 2148. First, the Supreme Court assumed without deciding that the removal orders were fundamentally unfair based upon the lower courts' reasoning regarding the removal hearings where the "respondents had apparently failed to understand the Immigration Judge's explanation of suspension of deportation." Id. at 831-32, 839-40, 107 S.Ct. 2148. It noted that the district court determined that the IJ failed to answer a respondent's question about his application for suspension of deportation, addressed the wrong respondent when addressing eligibility from suspension of deportation, did not clearly state how much time the respondents had to appeal his decision, and permitted obvious confusion, such that one respondent "did not understand the concept of suspension of deportation." Id. at 831 n.4, 107 S.Ct. 2148. It then pointed to the reasoning of the lower courts about the respondents' waivers, finding that the waivers were invalid because the respondents did not understand the proceedings. Id. at 832, 107 S.Ct. 2148. It went on to agree that the waivers were invalid:
If the violation of rights that took place in this case amounted to a complete deprivation of judicial review of the determination, that determination may not be used to enhance the penalty for an unlawful reentry under § 1326. We think it did. The Immigration Judge permitted waivers of the right to appeal that were not the result of considered judgments by the respondents, and failed to advise respondents properly of their eligibility to apply for suspension of deportation. Because the waivers of their rights to appeal were not considered or intelligent, respondents were deprived of judicial review of their deportation hearing.
Id. at 840, 107 S.Ct. 2148. The Court emphasized that the "respondents were deprived ... of any basis to appeal since the only relief for which they would have been *830 eligible was not adequately explained to them." Id. at 842, 107 S.Ct. 2148. Although § 1326(d) codifies Mendoza-Lopez , its reasoning about waiver is still applicable.
Mendoza-Lopez compels the same conclusion here-Vargas-Molina's waiver was invalid. In Mendoza-Lopez , similar reasons that led the lower courts to find that the hearings were constitutionally deficient led the Supreme Court to find that the waivers were unintelligent and unknowing. Although a due process violation is not a prerequisite to finding that a waiver was unintelligent and unconsidered, where a hearing is so deficient that it amounts to a constitutional violation, similar reasons will often render a waiver invalid. That is this case here. Like the respondents in Mendoza-Lopez , Vargas-Molina did not have his claim of relief properly explained to him. The IJs did not explain the process, legal standard, or evidence required for Vargas-Molina to make his case for voluntary departure. Therefore, he could not have known on what grounds he could have appealed, such as that the IJ should have examined his positive qualities and that he should have been permitted to introduce affirmative evidence of those qualities. It is equally salient here as it was in Mendoza-Lopez that Vargas-Molina was deprived of the only basis of his appeal, in this case voluntary departure, because he abandoned his application for cancellation of removal. For these reasons, Vargas-Molina's waiver is invalid as were the waivers in Mendoza-Lopez .[15]
This is consistent with what little applicable case law exists on waiver in cases where the IJ failed to fully develop the record. In United States v. Morales-Santiago , one of the grounds that the court found the defendant's waiver was invalid upon in a § 1326(d) attack was that the waiver was unintelligent because the IJ "prevent[ed] Defendant from fully developing the record" regarding his voluntary departure claim. 376 F. Supp. 3d 1105, 1117 (E.D. Wash. 2019) (citing United States v. Melendez-Castro , 671 F.3d 950, 954 (9th Cir. 2012) ; Agyeman , 296 F.3d at 887 ) (finding the waiver was also invalid because the defendant was not informed of his right to appeal or of his right to be informed of his eligibility for a certain type of relief). And in Perez-Gomez , the district court relied upon Mendoza-Lopez to find that the defendant's waiver was unintelligent because the IJ misstated the statutory requirement that a defendant must be able to fund his own departure and failed to discuss the other requirements for relief.[16] 2014 WL 6687586, at *10-13 (noting *831 that in the Eleventh Circuit, a noncitizen must also show he was not informed of his right to appeal for his waiver to be invalid). But cf. Cordova-Soto , 804 F.3d at 722-24 (finding that there was no fundamental unfairness because there was no due process violation when an ICE agent gave misinformation to a defendant about discretionary relief from removal, and so the waiver was valid).
Accordingly, Vargas-Molina has demonstrated that his waiver was not knowing and considered as Mendoza-Lopez requires, and so his inability to meet § 1326(d)(1)-(2) does not bar him from obtaining collateral relief.
IV. Conclusion
Vargas-Molina's Fifth Amendment due process right to a full and fair removal hearing was violated because the IJs failed to fully develop the record regarding his voluntary departure claim, and these violations prejudiced him because there is a reasonable probability that had the IJs not erred, he would have received voluntary departure. Due to the IJs' failures, Vargas-Molina did not know of the basis for an appeal, rendering his waiver of appeal unknowing and unintelligent. Therefore, Vargas-Molina has shown the entry of his 2011 removal order was fundamentally unfair, he is excused from the administrative exhaustion requirement, and he was deprived of the opportunity for judicial review. Accordingly, Vargas-Molina successfully challenges his 2011 order under § 1326(d), and it cannot serve as the basis of his indictment for illegal reentry under § 1326(a).
For these reasons, his first motion to dismiss his indictment (ECF No. 32 ) is GRANTED , and his second motion to dismiss his indictment (ECF No. 33 ) is DENIED AS MOOT . Accordingly, the indictment (ECF No. 13 ) is DISMISSED .
IT IS SO ORDERED.

If so, this document is not a part of the record, and there is no evidence that it was in Spanish or translated for the defendant. However, IJ Hacker explained the contents of the document to the group of individuals, and her explanation was interpreted. (Id. )

Between when Vargas-Molina filed his motions on April 23, 2019, and the United States filed its response on May 16, 2019, his application for asylum was denied. (See ECF No. 37, PageID.310.)

During this time, Vargas-Molina was permitted to remain in the United States while his application was processed. Department of Homeland Security & Department of Justice, I-589 Application for Asylum and for Withholding of Removal Instructions 13, https://www.uscis.gov/system/files_force/files/form/i589instr.pdf?download=1.

Vargas-Molina was served with the notice at Calhoun County Jail. (ECF No. 33-2, PageID.210-11.) The notice to appear lacked a date and time; rather, the date and time were "to be set." (Id. at PageID.210.)

In its supplemental brief, the United States attempts to distinguish Mendoza-Garcia from this case because Mendoza-Garcia considered a noncitizen's Fifth Amendment rights in his removal hearing on appeal of his removal order from the BIA under 8 U.S.C. § 1252(d). Id. at 503. This case considers the issue upon a collateral attack of an underlying removal order under § 1326(d). The government's argument belies the directive of § 1326(d)(3) itself. Section 1326(d)(3) requires that courts examine the underlying removal order and determine whether its entry was fundamentally unfair. This means looking at the hearing that led to its entry. The due process inquiry upon appeal and collateral attack of a removal order is the same. See also United States v. Flores-Perez, No. 19-20004, 2019 WL 2929187, at *2, 2019 U.S. Dist. LEXIS 112428 at *5 (E.D. Mich. July 8, 2019) (relying on Thomas v. Lynch , a case addressing due process on appeal of a removal order, 788 F.3d 638, 642 (6th Cir. 2015), to conclude the defendant could not satisfy § 1326(d)(3) ).

These include his "Print Rapsheet" (ECF No. 32-4 ) and his Department of Homeland Security records (ECF No. 32-7 ).

Whether courts phrase this right as the noncitizen's right to be informed of their eligibility for, to be considered for, or to obtain discretionary relief, the right is the same. See Estrada , 876 F.3d at 887-88 ; cf. United States v. Silvestre-Gregorio , No. 2:18-CR-00155, 2019 WL 2353215, at *15-16, 2019 U.S. Dist. LEXIS 92344, at *44-45 (E.D. Tenn. June 3, 2019) (rejecting an argument distinguishing between informing and obtaining as a tautology).

Although an IJ is required to notify noncitizens of the availability of discretionary relief if they appear to be eligible, 8 C.F.R. § 1240.11(a)(2) ; see In re Cordova , 22 I. & N. Dec 966, 971 (BIA 1999) (en banc), there is a circuit split regarding whether an IJ's failure to notify a noncitizen of discretionary relief amounts to a due process violation. Estrada , 876 F.3d at 888 (citing cases) (holding there is no constitutional right to be informed of eligibility for discretionary relief); see also United States v. Soto-Mateo , 799 F.3d 117, 123 (1st Cir. 2015) ; United States v. Santiago-Ochoa , 447 F.3d 1015, 1020 (7th Cir. 2006) ; Bonhometre v. Gonzales , 414 F.3d 442, 448 n.9 (3d Cir. 2005) ; United States v. Aguirre-Tello , 353 F.3d 1199, 1205 (10th Cir. 2004) (en banc); United States v. Lopez-Ortiz , 313 F.3d 225, 231 (5th Cir. 2002) ; Smith v. Ashcroft , 295 F.3d 425, 430 (4th Cir. 2002) ; Oguejiofor v. Attorney Gen. of the U.S. , 277 F.3d 1305, 1309 (11th Cir. 2002) ; Escudero-Corona v. INS , 244 F.3d 608, 615 (8th Cir. 2001) ; but see United States v. Lopez-Velasquez , 629 F.3d 894, 897 (9th Cir. 2010) (en banc); United States v. Copeland , 376 F.3d 61, 71 (2d Cir. 2004).

The United States also criticizes Vargas-Molina's reliance on cases from the Second and Ninth Circuits because those circuits held that noncitizens have a right to be informed of discretionary relief, but as in this circuit, the existence of a right to be informed is different than the right to a fully developed record, in this case once discretionary relief has been requested. For example, the fact that a noncitizen has a right be informed was not necessary to the Ninth Circuit's decision in Jacinto that an IJ's failure to fully develop the record as to voluntary departure violated due process. See 208 F.3d at 728-36. In fact, it could not have been; the Ninth Circuit did not consider the right to be informed in any context until 2001, see United States v. Ubaldo-Figueroa , 364 F.3d 1042, 1049 (9th Cir. 2004) (quoting United States v. Muro-Inclan , 249 F.3d 1180, 1182 (9th Cir. 2001) ) (addressing within the waiver context), which was a year after the court decided Jacinto .

At oral argument, the United States did not object to this standard. The Court asked Vargas-Molina whether he should be required to show that but for the error, his claims could have supported a different outcome based on Sako . Sako further defines the prejudice standard as: "Sako must establish that, but for the ineffective assistance of counsel, he would have been entitled to continue residing in the United States." 434 F.3d at 864 (emphasis added) (citing cases). However, Mendoza-Garcia did not use this "but for" language. Instead, it pointed to Al Khouri , which rejected a "but for causation" showing for prejudice, 362 F.3d at 466, and Strickland and Brady . No other court in this circuit has relied upon Mendoza-Garcia in formulating a prejudice standard, and the only two courts to have addressed prejudice since Mendoza-Garcia was decided did not apply Mendoza-Garcia 's standard. Compare Silvestre-Gregorio , 2019 WL 2353215, at *14-15, 2019 U.S. Dist. LEXIS 92344, at *41-42 (finding a defendant "must make a 'specific' showing of prejudice") (citing cases) with Flores-Perez , 2019 WL 2929187, at *7, 2019 U.S. Dist. LEXIS 112428, at *22 (relying upon Estrada to find no prejudice can be proven where the relief sought is discretionary).

Similarly, he was granted pretrial release in this case.

Vargas-Molina persuasively shows how things would have been different had IJ Nettles fully developed the record, indicating that he would probably satisfy a but for causation standard for prejudice.

Vargas-Molina clarified at oral argument that he was also arguing that IJ Hacker failed to inform him of his eligibility for voluntary departure on March 12, 2011, and that this helps him show that he was prejudiced. However, the IJ's errors on April 7, 2011, subsume any initial errors on March 12, and on April 7, Vargas-Molina was advised that voluntary departure could be an avenue of relief from deportation. Accordingly, the Court declines to consider this argument.

Contrary to the United States' position in its response brief, the dispute in this case is not about whether Vargas-Molina received some information about his appeal rights. Although it became clear at oral argument that Vargas-Molina did not sign a waiver of appeal, there is no dispute that Vargas-Molina received some sort of document explaining his appeal rights and that he heard what the IJs said about his appeal rights because an interpreter was present. Instead, the issue is whether he knew about any basis for appeal such that his waiver was knowing and intelligent.

Some courts read Mendoza-Lopez as considering waiver when the noncitizen was not informed at all of the availability of discretionary relief, see, e.g. , United States v. El Shami , 434 F.3d 659, 664 (4th Cir. 2005) ; Sosa , 387 F.3d at 137 ; but footnote four in Mendoza-Lopez demonstrates that it was a case about the failure of the IJ to adequately explain the type of relief that was being addressed at the hearing, Mendoza-Lopez , 481 U.S. at 840, 107 S.Ct. 2148 ("The [IJ] ... failed to advise respondents properly of their eligibility to apply for suspension of deportation." (emphasis added)), 842 ("Because respondents were deprived ... of any basis to appeal since the only relief for which they would be eligible was not adequately explained to them ..." (emphasis added)); see also United States v. Luna , 436 F.3d 312, 317-19 (1st Cir. 2006) (reading Mendoza-Lopez the same way but declining to decide the issue); United States v. Perez-Gomez , No. 3:13cr288-MHT, 2014 WL 6687586, at *12-13 (M.D. Ala. Nov. 26, 2014) (finding the noncitizen's waiver invalid under Mendoza-Lopez ). See also supra note 13.

This conclusion is also consistent with the cases on either side of the circuit split addressing whether there is a right to be informed of eligibility for discretionary relief, such as Estrada . Those cases address an IJ's failure to point to the existence of discretionary relief in an immigration hearing, but Vargas-Molina knew about the existence of discretionary relief; his hearing is only about his claim for discretionary relief and his collateral attack is premised upon his right to a fully developed record. Accordingly, neither cases that rely on nor reject that noncitizens have a right to be informed of the availability of discretionary relief are unpersuasive. See, e.g. , Richardson v. United States , 558 F.3d 216, 223 (3d Cir. 2009) (citing Bonhometre v. Gonzales , 414 F.3d 442, 448 n.9 (3d Cir. 2005) ); Ubaldo-Figueroa , 364 F.3d at 1049 (relying on the right to be informed to find a waiver is almost per se invalid); Sosa , 387 F.3d at 137 (citing Copeland , 376 F.3d at 71 ) (examining the factual circumstances of the defendant's knowledge at the time he waived his right to appeal). In short, those cases are equally distinguishable from and therefore equally persuasive, or unpersuasive, to Vargas-Molina's case because the nature of his hearing was so different.